*Debe, en su consecuencia, permitirse la intervención solicitada, radicándose en los autos la demanda y dándose a la misma el curso que determina la ley.*

El Juez Asociado Sr. Todd, Jr., no intervino.

El Pueblo de Puerto Rico, demandante y apelado, *v.* Antonio Figueroa, acusado y apelante. El Mismo *v.* El Mismo y El Mismo *v.* El Mismo.

Núms. 8583, 8584 y 8585.—*Sometidos:* Mayo 21, 1941. *Resueltos:* Mayo 23, 1941.

*A. Lastra Chárriez* y *A. D. Marchand Paz,* abogados del apelante; *Hon. Procurador General George A. Malcolm* y *R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

El 8 de julio de 1938 se presentaron en la Corte Municipal de Caguas tres denuncias contra Antonio Figueroa por infracciones a la ley sobre bebidas alcohólicas de 1936 cometidas una el diez de junio anterior y las otras dos el trece.

Condenado el acusado, apeló para ante la corte del distrito, Humacao, y en ella, el 6 de septiembre de 1939, se celebraron conjuntamente los nuevos juicios. Renunció el acusado el término para pronunciar sentencia a los fines de presentar cierto memorándum, y resuelta en su contra la cuestión en el mismo discutida, la corte el 14 de septiembre de 1939 dictó sus sentencias declarando al acusado culpable en los tres casos e imponiéndole en cada uno un mes de cárcel y las costas.

Apeló el acusado sometiendo sus recursos por un solo alegato. Señala tres errores cometidos a su juicio por la corte al no archivar a petición del fiscal una de las denuncias referentes a los delitos imputados como cometidos el trece de junio de 1938, al resolver que el fiscal no venía obligado a probar que el acusado no tenía inscritos los alambiques de que se trata, y al dictar sus sentencias en contra de la ley y de las pruebas.

Argumentando su primer señalamiento se expresa el apelante como sigue:

"Una simple lectura de las denuncias correspondientes a los casos 8584 y 8585 (véase págs. 1 y 2 de legajos dichos casos) bastará para concluir que en el mismo lugar y tiempo, al practicarse el allanamiento de morada a que ambas denuncias se refieren, fueron ocupados los dos alambiques (se menciona uno distinto en cada de-

nuncia) objeto de las mismas, razón por la cual la no inscripción de ambos artefactos en la Tesorería de Puerto Rico debió perseguirse en una sola denuncia, o, ya que la transacción en cuanto a dicha no inscripción de ambos artefactos apunta un solo delito comprendido en dos denuncias, una de ellas debió archivarse por la corte inferior. El fiscal que entendió en las mismas se dió cuenta de tal situación y por eso expresó en el inicio de la vista:

" 'Fiscal: Del día 13 de junio hay dos casos que son por el alambique. Yo creo que es lo mismo tener cien alambiques que uno solo; por cada alambique que se tenga no es un delito distinto. (Pág. 2 Transc. Ev.)'

"Y el mismo fiscal insistió, luego de oírse la declaración de uno de los principales testigos:

" 'Fiscal: Después de oída la declaración del Jefe Ceballos, el día 13 ha sido un solo elemento, a la misma hora y en el mismo sitio y yo entiendo que, aunque hubiera habido cien alambiques, el delito es uno. A los fines de las dos denuncias, yo entiendo que yo debo desistir de una. Y voy a solicitar el archivo de uno de los dos casos. (Pág. 47 Transc. Ev.)' "

No estamos conformes. La ley infringida o sea el artículo 81 de la Ley núm. 6 de junio 30, 1936 ((2) pág. 45), que es igual al artículo 72 de la núm. 115 de 1936 ((1) pág. 611) que citan los apelantes, prescribe:

"Toda persona que tenga en su poder o custodia o a su disposición en alguna forma, bien sea como dueño, arrendatario, depositario, o como guardián o en cualquier forma, un alambique montado o desmontado, que no esté inscrito en la oficina del Tesorero; o que dejare de inscribir un alambique que tenga en su poder, en calidad de depósito, bajo su custodia, o a su disposición en alguna forma; o que impida o estorbe la libre inspección del mismo a un agente de rentas internas, será culpable de un delito menos grave (*misdemeanor*). El Tesorero o sus agentes de rentas internas embargarán todo alambique que no esté inscrito, y lo confiscarán y venderán a beneficio de El Pueblo de Puerto Rico, o si lo estimaren conveniente, lo destruirán."

Como puede verse, lo que esa ley castiga es la falta de inscripción del alambique. Cada alambique requiere una inscripción separada y en su consecuencia cada falta de inscripción constituye una infracción distinta. No hubo error.

█ Levanta el segundo señalamiento una cuestión de evidencia que ha sido resuelta en sentido contrario a la contención del apelante por esta misma corte desde hace años.

Se formula textualmente así:

"La corte inferior cometió error al resolver que en casos por denuncias por infracción del artículo 72 de la 'Ley de bebidas alcohólicas de Puerto Rico' con relación a la no inscripción de alambiques en Tesorería Insular, el fiscal no viene obligado a probar en forma alguna que el acusado no tiene el alambique o alambiques inscritos en Tesorería Insular."

Y esta corte en el caso de *El Pueblo* v. *Millán*, 33 D.P.R. 921, resolvió que:

"Una vez demostrado que el alambique se ocupó en poder del acusado, es a éste a quien corresponde probar que lo tenía inscrito en la Tesorería de Puerto Rico. El Pueblo no está obligado a probar que el acusado no lo tenía inscrito."

Para llegar a esa conclusión la corte se basó en el caso de *El Pueblo* v. *Hernández*, 30 D.P.R. 368, en el que se dijo:

"Generalmente la prueba presentada consiste en la ocupación, en poder del acusado, del aparato destilatorio, y en una certificación del Tesorero creditiva de que en los archivos de su departamento no aparece que el acusado haya inscrito en la Tesorería alambique alguno o aparato de destilar de acuerdo con lo dispuesto en la sección 61 de la ley núm. 55 de junio 15, 1919. Y ésa fué en efecto la evidencia aportada por El Pueblo en esta causa.

". . . . el acusado se opuso por el fundamento de que el Tesorero no estaba autorizado para expedir certificaciones negativas. Cita el apelante en su alegato la Ley de Evidencia y el tratadista Jones, *The Blue Book on Evidence*, vol. 3, páginas 536, 537, 555, y 556. . . . .

"La cuestión es interesante, pero es innecesario resolverla. El Pueblo pudo prescindir de la certificación. Una vez demostrado que el alambique se ocupó en poder del acusado, era a éste al que correspondía probar, como cuestión de defensa, que lo tenía inscrito en la Tesorería de Puerto Rico.

"En la biografía del Juez Presidente Ruffin, aquel notable abogado que tanto influyó en la formación de la jurisprudencia de la Carolina del Norte, aparece el siguiente párrafo:

" 'En *Shaw* v. *Morrison*, estableció la doctrina, seguida desde entonces por todos los Estados de la Unión con excepción de uno, de que en una acusación por vender licores sin licencia, el peso de la prueba estaba sobre el acusado para demostrar la existencia de la licencia. 14 N.C.R. 299. Black *on Intoxicating Liquors*, pág. 507.' 4 Lewis, *Great American Lawyers*, 292.

"Cyc., basándose en decisiones de muchos Estados, establece la regla así:

" 'En casos en que se descansa en una licencia para vender como defensa de la persecución, el gobierno no está obligado a producir ninguna evidencia para sostener la alegación negativa de que la venta fué hecha sin licencia, sino que al contrario es el acusado quien debe asumir el peso de probar que estaba debidamente autorizado.' 23 Cyc. 247.

"Aunque aquí no se trata de la venta de licores sin licencia, la semejanza del caso es completa y la jurisprudencia aplicable.''

Por el tercero y último de los errores señalados se sostiene que la prueba es insuficiente.

La del Pueblo consistió en las declaraciones de los policías insulares Frank Navas y Domingo E. Llamas y en la del Jefe Alfonso Ceballos.

Refiriéndose Navas al diez de junio, 1938, y contestando a preguntas del fiscal, dijo:

"P.—¿En ese día 10 de junio de 1938, Ud. tuvo alguna intervención con él? (con el acusado)—R.—Sí, señor, la tuve. Le allané una casa donde se me había informado que . . .—P.—No diga lo que se le informó.— . . . —R.—Nosotros llegamos al sitio. Ese sitio tenía una verja de zinc, . . . y la puerta tenía una cadena que la cerraba . . . y cuando logramos abrir la cadena, que entramos al patio . . . encontramos que las puertas de la casa estaban cerradas . . .; como la orden de allanamiento que yo saqué primeramente era para la casa, los altos de la casa y un ranchón perteneciente a la misma casa que está en el patio, me dirigí hacia el ranchón para no perder tiempo . . . . empezamos a buscar rendijas . . . para observar para adentro hasta que pudimos observar por una de ellas que había licor o había baticiones y nos dió un olor a ron o a batición y había un candado pequeño en la puerta y rompimos el candado y al abrir la puerta encontramos que había cierto número de

baticiones y había unos cuantos galones de ron . . .—. . . También había un gran número de talegas de carbón. Cuando empezamos a destruir las baticiones, salió una señora . . . nos dijo: '¿Uds. estaban tocando la puerta?' Y le dijimos: 'Sí, señora.' '¿Qué quieren?' 'Pues queremos subir arriba porque tenemos una orden de allanamiento,' y nos dijo: 'Pasen' y nos abrió la puerta que conducía a la parte de arriba y entonces subimos y encontramos un número de frascos vacíos y también encontramos piezas que juntas formaban dos alambiques, o sea, dos drones de éstos, las serpentinas, cierto número de gomas, creo que unas tres gomas, cuatro pipotes refrigeradores de agua, un embudo. . . .''

Dijo además que el acusado estaba allí y ''le pregunté si él era el dueño de la casa y me dijo que no; le pregunté qué hacía allí y me dijo que estaba de visita y entonces le dije que yo tenía la seguridad de que él era el dueño de los aparatos y me dijo que no, que qué prueba tenía yo; entonces yo le tomé el nombre y las generales en compañía del Lance Corporal Llamas y tomamos los datos de todo lo que habíamos ocupado y procedimos a llevarlo al cuartel. . . . En esa casa no había nada de autorización de ninguna clase; todo lo que se ocupó allí era clandestino.''

Y refiriéndose al día trece, declaró:

''Para concluir: entramos y entonces había un alambique trabajando y había un embudo puesto en la pipita que la estaban llenando. . . . Yo vi dos drones montados sobre un anafre que estaban con candela, con carbón. . . . . . Dos drones montados con un aparato de esos que forman un triángulo así y después tiene una serpentina y una goma y después viene un galón y el chorro que iba saliendo . . .. De ron caña.''

El otro policía dijo que conocía al acusado desde hacía tres años y estuvo en su casa el día diez y el trece de junio, que allanaron la casa y lo encontraron allí. El diez ocuparon en la casa, arriba, todos los utensilios de un alambique y en una casilla en el patio una pipa de ron. El acusado dijo que no eran de él los efectos ocupados. No sabe de quién es la casa, ni quién paga los alquileres, pero sabe que la vive el acusado.

El Jefe Ceballos manifestó refiriéndose al trece de junio:

"Ese día, como a las diez de la mañana, la policía de Caguas tuvimos necesidad de ejecutar una orden de allanamiento en la residencia del Sr. Antonio Figueroa . . . al tratar de entrar a la casa para practicar la orden de allanamiento, nos cerraron las puertas de la escalera y tuvimos necesidad de forzar la puerta. . . . Cuando subimos arriba, bajaba un hombre que se llama Isabel Díaz, con un frasco de ron de un galón. . . . y cuando subimos a la cocina había dos alambiques funcionando y destilando ron y al lado de los alambiques había una pipita con diez galones de ron. . . . pasamos a una habitación de la casa y encontramos al acusado sentado en una cama y al lado de la cama había una pipa con ron y entonces destruímos las dos pipas, varios embudos y unas cuantas cosas más."

No vió en la casa a Santos Osorio ni a Manuel Negrón.

La prueba de la defensa consistió en las declaraciones de Santos Osorio, Isabel Díaz y Manuel Negrón y en varios recibos firmados en Caguas en enero, febrero, marzo, abril, mayo, junio y julio de 1938 por Cándido Martínez consignando en cada uno haber recibido de Santos Osorio "la cantidad de veinte pesos por concepto de la renta mensual de la habitación que ocupa."

Osorio dijo que se dedicaba a un "negocito" de alambique que tenía establecido en la calle Celis Aguilera núm. 3, en los altos de la casa propiedad de Cándido Martínez; que la policía entró a la casa y encontró unos aparatos, que cuando eso ocurrió subió el acusado que tiene un negocio de carnicería en los bajos a cobrarle una carne y la policía lo encontró allí.

Isabel Díaz recuerda que el diez de junio de 1938 estaba arriba del puesto de carne del acusado, en los altos, comprando un galón de ron a Osorio y lo cogió la policía. Que no le compró ron al acusado entonces ni en ninguna otra ocasión. Que Osorio no era empleado de Figueroa; que éste lo que tiene allí es un puesto de carne desde hace diez años.

Y Manuel Negrón manifestó que el diez de junio Osorio lo invitó a trabajar con él en su fábrica de ron en Celis Aguilera núm. 3, altos, y que la fábrica es de Osorio, no del acusado.

680

¿Es suficiente esa prueba?. Incompleta y poco convincente es la de descargo. El primer testigo no fija fechas y los últimos sólo se refieren a la del diez de junio. Los recibos no identifican la "habitación" alquilada. Además no fué creída por la corte.

Analizada la de cargo demuestra a nuestro juicio la ocupación de piezas de uno o dos alambiques el diez de junio de 1938 y de dos alambiques funcionando el trece en la casa en que vivía el acusado encontrando en ella a éste en ambas ocasiones, en la segunda sentado en una cama al lado de la cual había una pipa con ron.

Floja es en verdad, pero suficiente a nuestro juicio para sostener que no obstante su negativa del diez de junio a la policía, era el acusado el que tenía en su poder los alambiques no inscritos y por tanto que no erró la corte al declararlo culpable y condenarlo por las infracciones que se le imputaron.

*Deben en tal virtud declararse sin lugar los recursos y confirmarse las sentencias apeladas.*