EL PUEBLO DE PUERTO RICO, recurrido, *v.* JUDITH ARANDES DE CELIS ET AL., acusados y peticionarios.

*Número:* CE-85-597        *Resuelto:* 25 de febrero de 1988

*Pedro J. Varela*, abogado de los peticionarios; *Josefa A. Román García, Procuradora General Auxiliar*, abogada de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El presente recurso nos ofrece la oportunidad de resolver si, en relación con el Art. 181 del Código Penal de 1974 (33 L.P.R.A. sec. 4287), la falta de consentimiento por parte del custodio de la propiedad pública es un elemento del delito que prohíbe la fijación de pasquines en dicha propiedad, y si la exclusión de los postes de la prohibición de fijar pasquines en propiedad pública incluye las columnas de los puentes.

Este caso tuvo su génesis cuando dos grupos de personas fueron detenidos por la Policía debido a que se sospechaba

estaban pegando pasquines. El primero de estos grupos fijó los pasquines en las columnas del puente que cruza la Ave. Iturregui en Río Piedras y une la Villa Panamericana con las facilidades deportivas instaladas allí para los Juegos Panamericanos. El segundo los fijó en las columnas del puente que cruza la Ave. Domenech en Hato Rey.

Los pasquines ocupados por la Policía tenían el mensaje siguiente: "PANAMERICANOS 79, BIENVENIDOS, PARTIDO SOCIALISTA PUERTORRIQUEÑO." Mostraban, además, la bandera de Estados Unidos arriada y la bandera de Puerto Rico al tope del asta. La Policía también ocupó en ambos sitios brochas, cubos de goma y pega.

Los integrantes de ambos grupos fueron acusados de violar el Art. 181 del Código Penal de 1974, *supra*, Ley Núm. 115 de 22 de julio de 1974, según enmendada por la Ley Núm. 4 de 13 de junio de 1976. El Tribunal de Distrito los encontró culpables y condenó a pagar una multa de cincuenta ($50) dólares cada uno, o en su defecto, un día de cárcel por cada cinco ($5) dólares que dejaran de satisfacer. Los acusados apelaron ante el Tribunal Superior. Mediante sentencia de 13 de agosto de 1985, éste declaró sin lugar la apelación. De esta sentencia recurrieron ante nos mediante recurso de *certiorari*. Alegaron que el tribunal de instancia erró al no resolver que el Ministerio Público tenía que probar, como elemento del delito, la falta de consentimiento para pasquinar en los lugares utilizados por los peticionarios, y que el Art. 181 del Código Penal de 1974, *supra*, excluye las columnas de puentes de la prohibición de fijar pasquines en propiedad pública.

El Art. 181 del Código Penal de 1974, *supra*, en su parte pertinente dispone:

> Toda persona que pegare, fijare, imprimiere, o pintare sobre propiedad pública, *excepto en postes*, o sobre cualquier propiedad privada, *sin el consentimiento del custodio, dueño*

*o encargado*, cualquier aviso, anuncio, letrero, cartel, grabado, pasquín, cuadro, mote, escrito, dibujo, figura o cualquier otro medio similar, no importa el asunto, artículo, persona, actividad, tema, concepto o materia a que se haga referencia en los mismos, será sancionada con multa mínima de cincuenta (50) dólares y máxima de doscientos cincuenta (250) dólares. (Énfasis suplido.)

## I

*La falta de consentimiento como elemento de la conducta acriminada—Art. 181*

En *Mari Bras* v. *Alcaide*, 100 D.P.R. 506 (1972), tuvimos la oportunidad de interpretar el alcance del anterior Art. 517(6) del Código Penal de 1937, que prohibía fijar pasquines en propiedad pública o privada sin el consentimiento del dueño. En esa ocasión a los acusados apelados se les denunció por pegar pasquines que contenían el mensaje "LAS PLAYAS PARA EL PUEBLO—Movimiento Pro Independencia" en el Puente Dos Hermanos y en ciertos postes del alumbrado público. La controversia giró en torno a si dicho artículo prohibía sólo la fijación de pasquines que contenían mensajes relacionados con artículos de comercio o si, por el contrario, cubría la fijación de pasquines con todo tipo de mensajes. Optamos por la primera de estas interpretaciones. El caso nos brindó la oportunidad de reconocer que la fijación de pasquines constituye un ejercicio de las libertades de expresión y prensa. Además, observamos que es un medio de difusión de ideas, inquietudes y protestas de uso generalizado en Puerto Rico.

La fijación de pasquines es uno de los medios más económicos y efectivos para la divulgación de ideas a la ciudadanía en general. Es el mecanismo de comunicación masiva que, como regla general, tienen a su alcance los grupos minoritarios y disidentes de escasos recursos económicos. Cónsono

con estas realidades en *Mari Bras* v. *Alcaide*, supra, pág. 510, expresamos:

> En general, una disposición legislativa que tiene como propósito la limitación de la libre expresión se verá sujeta a un examen minucioso (*careful scrutiny*) y será válida sólo si está redactada en términos limitados (*narrowly drawn*) para proteger un interés legítimo e importante del estado (*legitimate and compelling state interest*) . . . . *Como consecuencia, sería inválida una prohibición absoluta de libre expresión y aun una restricción que, sin ser absoluta, sea innecesariamente abarcadora.* (Énfasis suplido y citas omitidas.)

Con este trasfondo, en 1974, como parte de la reforma penal, se aprobó el Art. 181, *supra,* con el propósito de ampliar el alcance de la prohibición para incluir todo tipo de pasquines y armonizarla con las normas enunciadas en el caso de *Mari Bras* v. *Alcaide*, supra. En 1976 el artículo fue enmendado para excluir de la prohibición la fijación de pasquines en postes y eliminar los requisitos de interés público y valor histórico o artístico al referirse a las propiedades públicas, en las cuales se prohibía la fijación de pasquines.[1]

■ En la exposición de motivos de la ley se expresó que ésta representaba "parte de un programa de gobierno dirigido a armonizar los intereses de expresión con los de convivencia social. . . . *El elemento central de esta medida es permitir a los custodios, dueños, o encargados de propiedades públicas y privadas ejercer su consentimiento a la imposición de carteles en sus propiedades. Este elemento* junto al programa afirmativo de proveer alternativas a la expresión, *representa un genuino esfuerzo de garantizar la mejor convivencia de nuestro pueblo*". (Énfasis suplido.) 1976 Leyes de Puerto Rico 686.

---

[1] Ley Núm. 4 de 13 de junio de 1976, Leyes de Puerto Rico, pág. 686.

■ Como podrá observarse, el consentimiento para pasquinar fue el mecanismo utilizado por el legislador para armonizar y balancear el ejercicio de las libertades de expresión y prensa de los ciudadanos con la protección del derecho de propiedad del Estado.

■ En relación con la propiedad pública, el Secretario de Transportación y Obras Públicas es el custodio de la misma. Éste "vigilará todas las obras públicas estaduales y tendrá a su cargo todas las propiedades estaduales",(2) "todos los edificios públicos pertenecientes al Estado Libre Asociado de Puerto Rico y todas las obras públicas estaduales sea cual fuere su naturaleza".(3)

---

(2) Código Político, 1902, Art. 133; Mayo 12, 1942, Núm. 212, pág. 1065, Sec. 8; Plan de Reorg. Núm. 10 de 1950, Art. III(d); Julio 2, 1981, Núm. 18, pág. 125, ef. Julio 2, 1981; 3 L.P.R.A. sec. 411:

*"Secretario de Transportación y Obras Públicas; facultades y deberes*

"El Secretario de Transportación y Obras Públicas *vigilará todas las obras públicas estaduales, y tendrá a su cargo todas las propiedades estaduales,* incluyendo los edificios, caminos y puentes públicos, las fuerzas hidráulicas, los ríos no navegables y sus cauces, las aguas subterráneas, minas y minerales debajo de la superficie de terrenos particulares, los terrenos públicos y las tierras públicas, los registros y archivos públicos y terrenos saneados; excepto todas las propiedades adjudicadas al Estado Libre Asociado de Puerto Rico en cobro de contribuciones en o antes de la fecha de efectividad de esta ley, que no se utilicen para fines públicos; Disponiéndose, que el Secretario de Hacienda, en consulta con el de Justicia, tendrá a cargo la administración y disposición de los bienes inmuebles así adjudicados, de los cuales podrán disponer mediante arrendamiento o venta en pública subasta, conforme al reglamento aprobado por ellos, cuyo producto ingresará al Fondo General." (Énfasis suplido.)

(3) Art. 393 del Código Político, 3 L.P.R.A. sec. 417.

*"Edificios, obras y bienes públicos, a cargo del Secretario*

"El Secretario de Transportación y Obras Públicas tendrá a su cargo todos los edificios públicos pertenecientes al Estado Libre Asociado de Puerto Rico y todas las obras públicas estaduales sea cual fuere su naturaleza y nombre, ya fueren costeadas con fondos donados, o asignados por cualquier persona o corporación o por el Gobierno o Congreso de los Estados Unidos, a beneficio del Estado Libre Asociado de Puerto Rico. Estará encargado asimismo de toda la propiedad cedida por el Gobierno de España al de los Estados Unidos, y cuya administración se puso en manos del Gobierno de Puerto Rico con arreglo a la sección 13 de la Ley del Congreso denominada 'Ley para proveer, temporalmente, de rentas y un gobierno civil a la Isla de Puerto Rico, y para otros fines'."

A tenor con estos deberes y facultades y en virtud de lo dispuesto en el Art. 181 del Código Penal de 1974, el Secretario de Transportación y Obras Públicas

536

■ Al interpretar el actual Art. 181, *supra*, no podemos apartarnos de la corriente central de las necesidades y usos de nuestro pueblo. Tanto de una lectura del Art. 181, *supra*, como de un estudio del historial legislativo y de la trayectoria histórica(4) de la medida, surge que "[l]a conducta acrimi-

---

promulgó el 13 de junio de 1976 una resolución donde otorgaba su consentimiento para el uso de los tablones de expresión pública:

"Por virtud de la facultad que me confiere[n] la Ley Núm. 4 de 13 de junio de 1976 y la Ley Núm. 212 de 12 de mayo de 1942, según enmendada, *doy el consentimiento* para el uso de los tablones de expresión pública en las propiedades públicas bajo mi custodia, para pegar, fijar, imprimir o pintar cualquier aviso, anuncio, letrero, cartel, grabado, pasquín, cuadro, mote, escrito, dibujo, figura o cualquier otro medio similar, no importa el asunto, artículo, persona, actividad, tema, concepto o materia a que se haga referencia en los mismos.

"Además, decreto el Reglamento para establecer las normas para el uso de los tablones de expresión pública en los cuales se llevará a cabo exclusivamente las actividades mencionadas arriba." (Énfasis nuestro.)

Llamamos la atención al hecho de que según certificación del Departamento de Estado emitida el 20 de julio de 1987, "hasta el presente el Departamento de Transportación y Obras Públicas no ha radicado en [el Departamento de Estado], a tenor con las disposiciones de la Ley Núm. 112 del 30 de junio de 1957, según enmendada, el Reglamento para Regular los Tablones de Expresión Pública en las propiedades públicas bajo la custodia del Secretario de Transportación y Obras Públicas . . . ."

(4) Un análisis de la trayectoria histórica de este artículo refleja que la disposición original provino del Art. 602(f) del Código Penal de California. Se incorporó a nuestro ordenamiento jurídico a través del Art. 517(6) del Código de 1937. Este artículo estuvo vigente hasta junio de 1974 cuando se aprobó el Art. 181, Ley Núm. 115 de 22 de julio de 1974.

Deering's California Codes, Penal Code Annotated, 1983 edition, Bancroft Whitney, sec. 602, pág. 616:

*"Sec. 602. Tresspasses constituting misdemeanors; enumeration*

. . . . . . . . .

"(f) . . . or putting up, affixing, fastening, printing, *or painting upon any property belonging to the state, or to any city, county, town, or village, or dedicated to the public, or upon any property of any person, without license from the owner,* any notice, advertisement, or designation of, or any name for any commodity, whether for sale or otherwise, or any picture, sign, or device intended to call attention thereto." (Énfasis suplido.)

Véase Art. 517(6) del Código Penal de 1937 (33 L.P.R.A. ant. sec. 2067) ed. 1956:

*"Sec. 2067. Transgresión*

"Incurrirá en delito menos grave toda persona que voluntariamente cometiere cualquiera de las siguientes violaciones:

. . . . . . . . .

"6. Poner, pegar, fijar, imprimir o pintar sobre cualquier propiedad perteneciente al gobierno o municipio, ciudad o pueblo, o consagrada al público, o sobre

nada consiste de pegar, fijar, imprimir o pintar sobre propiedad pública o privada alguno de los carteles descritos en el tipo *sin la autorización de la persona encargada de la propiedad o del propietario".* (Énfasis nuestro.) D. Nevares-Muñiz, *Código Penal de Puerto Rico, Revisado y Comentado,* San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 322.

■ Resolvemos, pues, que la falta de consentimiento para pasquinar es un elemento esencial del delito que el Ministerio Público viene obligado a probar. En el caso de autos no se probó la falta de consentimiento para pasquinar, elemento esencial del delito.

## II

*La exclusión de los "postes" de la prohibición de fijar pasquines del Art. 181.*

Resta ahora considerar si las columnas de los puentes están incluidas dentro de la excepción que estableció la enmienda de 1976[5] al Art. 181, *supra.* Esta enmienda excluyó específicamente los postes de la prohibición de fijar pasquines en propiedad pública sin el consentimiento de su custodio.

---

la propiedad de cualquiera persona, *sin permiso del dueño,* cualquier aviso, anuncio, designación o nombre de cualquier artículo, para ofrecerlo en venta, u otro fin, o cualquier cuadro, letrero o mote, con objeto de llamar la atención hacia el mismo." (Énfasis suplido.)

La Ley Núm. 115, *supra,* dispone:

"Toda persona que pegare . . . sobre cualquier propiedad pública cuya visibilidad o utilidad esté revestida de un particular interés público, o que tenga un valor histórico o artístico, o sobre cualquier propiedad privada *sin el consentimiento del dueño o encargado . . . ."* (Énfasis suplido.) 1974 Leyes de Puerto Rico 503.

Como podrá observarse, el elemento común en todas estas disposiciones es que lo que se prohíbe es pasquinar sin el consentimiento del dueño o encargado.

[5] Ley Núm. 115, *supra.*

█ Reiteradamente hemos decidido que un estatuto penal debe ser interpretado restrictivamente en cuanto a lo que desfavorece al acusado y liberalmente en cuanto a lo que lo favorezca. *Mari Bras* v. *Alcaide*, supra, pág. 516; *El Pueblo* v. *Padilla*, 20 D.P.R. 276 (1914). El Art. 6 del Código Penal de 1974, 33 L.P.R.A. sec. 3021, a su vez dispone que "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente". Como podrá observarse, "junto con la doctrina del recto sentido de los términos se adoptó la política de interpretar la ley de la manera más favorable al acusado *siempre que lo permitiera el lenguaje de la ley y las circunstancias de su aplicación, así como el espíritu e intención de la misma*". (Énfasis suplido.) Nevares-Muñiz, *op. cit.*, pág. 11.[6]

█ Recientemente en *Pacheco* v. *Vargas, Alcaide*, 120 D.P.R. 404, 410–411 (1988), expresamos que "[l]os estatutos penales deben interpretarse a la luz de la realidad social de donde surgen y operan. Nuestro deber es interpretar las

---

[6] Con respecto al Art. 6 del Código Penal, 33 L.P.R.A. sec. 3021, la profesora Nevares-Muñiz se expresa como sigue sobre la interpretación del estatuto penal:

"El primer párrafo del artículo 6 enuncia la regla general de interpretación que habrá de seguir el magistrado al aplicar la ley. En los países de la órbita jurídica de la Europa continental se clasifica la interpretación judicial a base de los medios utilizados y del resultado obtenido. En ese esquema de clasificación la regla enunciada en el primer párrafo del artículo correspondería respectivamente a lo que se conoce como interpretación *gramatical* e interpretación *declarativa*. Nevares Muñiz, Derecho Penal, Sec. 4.5.2.

"La interpretación *gramatical* se refiere a que el *magistrado habrá de examinar el significado gramatical de las palabras y la sintaxis de las oraciones en la ley. Si el análisis revela una interpretación clara ahí habrá de concluir la interpretación del magistrado.*

"Cuando la interpretación se evalúa en términos del resultado, tenemos en el artículo un caso de interpretación declarativa. Se trata de aquella interpretación donde el juez aplica la ley estableciendo una correspondencia exacta entre la letra y el espíritu de la ley." (Énfasis suplido.) D. Nevares-Muñiz, *Código Penal de Puerto Rico, Revisado y Comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 10.

leyes en el contorno de una situación social y económica actual para resolver controversias humanas de profundas implicaciones personales para los afectados y para la comunidad en general . . . . Nunca debemos olvidar que 'el sentido de hoy no es siempre el sentido de mañana' . . . [y que l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas . . . '[nosotros los jueces] no [podemos estar] ajeno[s] a las transformaciones sociales, científicas y jurídicas. *La ley vive y se desarrolla en ambientes que cambian y evolucionan, y si no queremos estarla reformando de un modo frecuente, preciso es que la adapte[mos], como su propia voluntad permite, a las nuevas necesidades de la época.' . . . '[Las leyes hay que interpretarlas] a la luz de las realidades específicas de la sociedad en que opera' ".* (Énfasis suplido y citas omitidas.)

Tomando en consideración los criterios interpretativos antes enunciados y el hecho de que estamos ante un estatuto penal que tiende a restringir y reglamentar el derecho constitucional a la libertad de expresión,[7] pasemos a considerar el alcance de la exclusión provista por el Art. 181, *supra,* en relación con la fijación de pasquines en los "postes". En el caso *Vázquez Negrón* v. *E.L.A.*, 109 D.P.R. 19, 24 esc. 3 (1979), señalamos que "[r]egularmente, recurrimos al diccionario como fuente confiable para determinar el significado de una palabra, presumiendo que el legislador lo conoce". Ahora bien, el vocablo "poste" se define por el Diccionario de la Real Academia Española como: "Madero, piedra o columna colocada verticalmente para servir de apoyo o de señal." (Énfasis suplido.) *Diccionario de la Lengua Española,*

---

[7] Véase nuestra discusión anterior sobre la limitación a la libre expresión (Parte I de esta opinión).

540

20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1091.(8)

■ De otra parte, tenemos que el debate legislativo que se efectuó en la Cámara de Representantes de Puerto Rico y que condujo a la aprobación del Art. 181, *supra*, aunque limitado, arroja alguna luz sobre la intención del legislador al aprobar la medida. Al discutirse la exclusión de los postes de la prohibición de fijar pasquines en propiedad pública, tanto el Representante Sr. Carlos Gallisá, como el Representante Sr. Eloy Aponte Colón, estuvieron de acuerdo en que ésta incluía "[t]odos los postes". (Énfasis suplido.)(9) El Representante Sr. Jorge Orama Monroig, por su parte, al consumir turno a favor de la medida, expresó que el anterior Art. 181, *supra*, había sido ineficaz en evitar "las pasquinadas indiscriminadas" y que por eso la nueva legislación permitía fijar pasquines sin necesidad de autorización en los postes, observando que "los postes del alumbrado público generalmente están localizados . . . en sitios bien visibles".(10)

---

(8) El *Diccionario General Ilustrado de la Lengua Española, Vox*, 3ra ed., Madrid, Ed. Biblograf, 1976, pág. 1264, ofrece una definición idéntica.

(9) "SR. GALLISÁ: Ademá[s], de 'excepto en postes' había alguna otra excepción en el anterior Artículo.
SR. APONTE COLÓN: En el anterior no había excepción. Ahora se puso 'excepto en postes'.
SR. PRESIDENTE: Contestada la pregunta.
SR. GALLISÁ: Señor Presidente, para ver si puedo hacer otra pregunta.
SR. PRESIDENTE: Adelante, compañero.
SR. GALLISÁ: No había una excepción de postes de telégrafos. O si fue que se eliminó a los fines de cuadrar bien la intención legislativa.
SR. APONTE COLÓN: Sí. En postes se entienden [*sic*] que son de telégrafos y de teléfono.
SR. GALLISÁ: *Todos los postes.*
SR. APONTE COLÓN: Todos los postes."

(10) Representante señor Orama Monroig:

". . . Y no hay duda alguna, compañero Aponte Toro, que esto es ya un problema. Es un problema de tal naturaleza que el Artículo 181, como está concebido en el Código Penal Nuevo, no ha resultado eficaz, precisamente para lo que se

Al tomar en consideración la discusión anterior y a la luz de las necesidades y realidades del Puerto Rico de hoy, resolvemos que el propósito y espíritu del Art. 181, *supra*, en relación con la propiedad pública, es excluir de la prohibición de fijar pasquines *todos los postes*, entre éstos claro está, las columnas de los puentes. De esta manera, aunque se prohíbe la indeseable "pasquinada indiscriminada", se permite un vehículo de expresión, económico y eficaz, localizado generalmente en lugares o sitios visibles, que a su vez limita a un mínimo razonable la intervención del Estado con el fundamental derecho a la libre expresión.

■ Todo lo anteriormente expuesto nos lleva a concluir que la exclusión de los postes de la prohibición del Art. 181, *supra*, de fijar pasquines en propiedad pública incluye las columnas de los puentes y que, por lo tanto, en éstas se pueden fijar pasquines sin necesidad de autorización de su custodio.

## III

*Implantación discriminatoria del Art. 181.*

Nada repugnaría más nuestra conciencia judicial que permanecer mudos, o como meros espectadores o tibios guardianes de la ley y el derecho, ante una situación de menoscabo o violación al esencialísimo y fundamental derecho a la libertad de expresión. Si ello ocurriera, el derecho, en su expresión última que es hacer justicia, se constituiría, en ese trágico momento, en un cómplice de la inacción sofocante de

---

quería desalentar en la forma más efectiva, las *pasquinadas indiscriminadas*. Por eso es que en esta nueva legislación se permite en primer lugar, sin autorización de nadie *en los postes*, los postes del alumbrado público generalmente están localizados como todos sabemos en sitios bien visibles. Y ahí van los retratos de los compañeros del Ala Derecha, del Ala Izquierda[,] del Centro, de cualquiera . . . ." (Énfasis suplido.)

la voz individual y, por ende, en un instrumento opresor de la conciencia social del pueblo. Esto nunca lo permitiremos.

Hemos examinado y analizado detallada y cuidadosamente el récord de este caso. Discrepamos de la forma y manera en que fueron expresados e interpretados los hechos en la opinión concurrente del Juez Asociado Señor Negrón García. El récord no avala esa interpretación.

Dicha opinión concurrente es sumamente limitativa del derecho a la libertad de expresión, con la cual no podemos estar de acuerdo. Al interpretar el vocablo "postes" como uno que incluya únicamente "los postes de alambrado eléctrico, teléfono y del telégrafo", se restringen de forma inaceptable los lugares que el legislador específicamente excluyó de la prohibición de pasquinar en propiedad pública sin el consentimiento de su custodio y consagró como sitios apropiados para la divulgación efectiva de ideas. Esta interpretación aumenta la facultad del ejecutivo para limitar los lugares públicos que estarán disponibles para la transmisión y comunicación de mensajes e ideas. Tiene el indeseable efecto de otorgar mayor facultad al Estado para, de forma indirecta, controlar o por lo menos reducir la comunicación de ideas o posiciones minoritarias. No podemos estar de acuerdo con una interpretación que conlleve tales resultados.

La opinión concurrente del Juez Asociado Señor Negrón García, además, al resolver que el elemento del delito de la falta de consentimiento del custodio de la propiedad pública es una defensa, ha convertido una modalidad del ejercicio de la libertad de expresión en una actividad presumiblemente delictiva. Tampoco podemos suscribir esta interpretación.

La interpretación que hoy hacemos del Art. 181, *supra,* salvaguarda, en su forma más amplia y auténtica, el derecho al ejercicio de la libertad de expresión, no sólo para estos acusados, sino también para cualesquiera otros cuidadanos

que ejerciten en el futuro esta modalidad del derecho a la libertad de expresión. La posición adoptada en la opinión concurrente sólo protege a estos acusados. El ejercicio de este derecho fundamental debe estar disponible para todos los integrantes de nuestra sociedad, libre de asfixiantes consideraciones ideológicas, sociales, políticas y económicas. Las minorías, los disidentes y los desvalidos de nuestra sociedad, los que usualmente no tienen acceso a una sofisticada y costosa prensa, televisión y radio, deben ser protegidos. Hay que garantizarles el derecho a poder expresar y comunicar sus ideas de forma efectiva, sin cortapisas o limitaciones irrazonables o innecesarias. El fluir de las ideas, el diálogo público, la controversia y la discusión de opiniones abren nuevas avenidas, alternativas y opciones, y promueven la comprensión entre los seres humanos. El Art. 181, *supra*, hay que interpretarlo de forma tal que fomente y propicie este ambiente de mejor entendimiento mediante la efectiva comunicación de ideas. De esta manera seremos más sabios y más libres.

Por las consideraciones expuestas, *se dictará sentencia en la que se revoca la aquí recurrida.*

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Negrón García emitieron opiniones concurrentes. El Juez Asociado Señor Ortiz no intervino.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

"Sea prédica de orientación liberal, conservadora, marxista o de otra índole —de ideología estadista, autonomista o independentista— la levadura que hace crecer nuestro sistema democrático es el libre intercambio y el choque

pacífico de ideas. La igual oportunidad ... para diseminarlas es requisito indispensable y consustancial a ese postulado." *P.S.P.* v. *Srio. de Hacienda*, 110 D.P.R. 313, 327 (1980).

" . . . [L]o acontecido en el caso de autos no es materia muerta para la historia, ya que el ejercicio de la libre expresión es de valor comtemporáneo e imperecedero en nuestro país." *E.L.A.* v. *Rivera Rivera*, 105 D.P.R. 640, 642 (1977), opinión disidente. Expongamos sus hechos.

## I

El Ministerio Público denunció a Judith Arandes de Celis y a otros miembros activos del Partido Socialista Puertorriqueño (P.S.P.), por infringir el Art. 181 del Código Penal, 33 L.P.R.A. sec. 4287. Se les imputó que el 27 de junio de 1979, aproximadamente a las 11:00 P.M., ilegal y voluntariamente, de común acuerdo, pegaron y fijaron pasquines sobre las columnas de un puente situado en la Ave. Domenech, Hato Rey, y otro ubicado en la Ave. Iturregui, Río Piedras, frente a la Villa Panamericana, ambos propiedades públicas. Esa noche también fueron arrestados y denunciados otros miembros del P.S.P., por igual acción, en Levittown, Toa Baja.

Las denuncias fueron precedidas de arrestos por la Policía de Puerto Rico en los distintos lugares indicados. Los pasquines ocupados por la Policía exponían el mensaje siguiente: "PANAMERICANOS 79, BIENVENIDOS, PARTIDO SOCIALISTA PUERTORRIQUEÑO." Ilustraba la bandera de Estados Unidos arriada y la de Puerto Rico al tope del asta.

Ante el Tribunal de Distrito, Sala de Río Piedras, fueron encontrados culpables y sentenciados a una multa de $50 o, en su defecto, prisión subsidiaria. En apelación, el Tribunal Superior, Sala de San Juan, confirmó. Acordamos revisar.

## II

Aunque la decisión del Tribunal, como técnica adjudicativa, tal vez sea la avenida decisoria menos escabrosa, no podemos refrendar el resultado. Primeramente, no nos persuade la interpretación apretada de que las "columnas" de concreto de los puentes en que fueron fijados los pasquines aludidos caen bajo la excepción del vocablo "postes", provisto en el Art. 181 del Código Penal, *supra*.(1) Esa conclusión es forzada. Se arriba al acudir a la definición de "poste" consignada en el *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1091 y el *Diccionario General Ilustrado de la Lengua Española, Vox*, 3ra ed., Barcelona, Ed. Biblograf, 1976, pág. 1264, a saber, "madero, o piedra o columna colocada para servir de apoyo o de señal".

Aunque un diccionario es fuente válida para investigar el sentido literal de las palabras, en buena hermenéutica, no debemos olvidar que nuestra misión es averiguar su sentido jurídico. Aquí el Art. 6 del Código Penal traza ese rumbo. Se inspira en el espíritu de que "[l]as palabras y frases se interpretarán según *el contexto y el significado sancionado por el*

---

(1) Dicho artículo dispone:

"Toda persona que pegare, fijare, imprimiere o pintare sobre propiedad pública, *excepto en postes,* o sobre cualquier propiedad privada, sin el consentimiento del custodio, dueño o encargado, cualquier aviso, anuncio, letrero, cartel, grabado, pasquín, cuadro, mote, escrito, dibujo, figura o cualquier otro medio similar, no importa el asunto, artículo, persona, actividad, tema, concepto o materia a que se haga referencia en los mismos, será sancionada con multa mínima de cincuenta (50) dólares y máxima de doscientos cincuenta (250) dólares. Las convicciones subsiguientes por el mismo delito serán sancionadas con pena de reclusión que no excederá de quinientos (500) dólares, o ambas penas a discreción del tribunal. El tribunal sentenciador podrá requerir de la persona convicta del delito para que resarza a la parte perjudicada de los daños ocasionados o para que asuma la obligación de corregir el mal causado por su acto delictivo." (Énfasis suplido.) 33 L.P.R.A. sec. 4287.

*uso común y corriente*". (Énfasis suplido.) 33 L.P.R.A. sec. 3021.

Bajo este enfoque, en nuestro país —ni aun en los círculos culturales o académicos más refinados, o en el argot técnico de la ingeniería— el término "poste" es sinónimo de "columna de un puente". Todo lo contrario. Su uso común y corriente es con referencia a los *postes* de alumbrado eléctrico, teléfono y telégrafo. Así fue visualizado e incorporado por la Asamblea Legislativa en el Art. 181, *supra*.

El siguiente debate —que culminó con su texto actual— lo confirma:

SR. GALLISÁ: Ademá[s] de 'excepto en postes' había alguna otra excepción en el anterior Artículo.

SR. APONTE COLÓN: En el anterior no había excepción. Ahora se puso 'excepto en postes'.

SR. PRESIDENTE: Contestada la pregunta.

SR. GALLISÁ: Señor Presidente, para ver si puedo hacer otra pregunta.

SR. PRESIDENTE: Adelante, compañero.

SR. GALLISÁ: *No había una excepción de postes de telégrafos.* O si fue que se eliminó a los fines de cuadrar bien la intención legislativa.

SR. APONTE COLÓN: Sí. *En postes se entienden* [sic] *que son de telégrafos y de teléfono.*

SR. GALLISÁ: *Todos los postes.*

SR. APONTE COLÓN: *Todos los postes.* (Énfasis suplido.)

Luego, en un turno posterior en favor de la medida, el señor Orama Monroig expresó:

. . . Y no hay duda alguna, compañero Aponte Toro, que esto es ya un problema. Es un problema de tal naturaleza que el Artículo 181, como está concebido en el Código Penal Nuevo, no ha resultado eficaz, precisamente para lo que se quería desalentar en la forma más efectiva, las pasquinadas indiscriminadas. Por eso es que en esta nueva legislación se permite en primer lugar, sin autorización de nadie *en los postes, los postes del alumbrado público generalmente están localizados como*

*todos sabemos en sitios bien visibles. Y ahí van los retratos de
los compañeros del Ala Derecha, del Ala Izquierda[,] del Cen-
tro, de cualquiera* . . . . (Énfasis suplido.)

En *Vázquez Negrón* v. *E.L.A.*, 109 D.P.R. 19, 24 esc. 3
(1979), indicamos:

Regularmente, recurrimos al diccionario como fuente con-
fiable para determinar el significado de una palabra, presu-
miendo que el legislador lo conoce. *Cooperativa Cafeteros* v.
*La Capital*, 82 D.P.R. 51, 62–63 (1961). Ahora bien, si del tras-
fondo e historial legislativo del lenguaje que se interpreta
surge que el legislador pretendió usar determinada palabra o
frase queriendo describir algo distinto de lo que apunta el dic-
cionario, debe prevalecer ese sentido distinto. *Autoridad so-
bre Hogares* v. *Tribl. Superior*, 82 D.P.R. 344, 359–360 (1961);
*Sierra, Com.* v. *San Miguel Fertilizer Corp.*, 73 D.P.R. 341,
346 (1952).

Tal es el caso de autos. El legajo legislativo tiende a sos-
tener que la palabra "postes" fue concebida en su acepción
limitada y tradicional de postes de alumbrado eléctrico, telé-
fono y del telégrafo. No hay el más mínimo indicador en que
apuntalar la interpretación que hace este Tribunal. No cabe
la misma. Aun en lo penal, una interpretación restrictiva no
puede ser contraria a una evidente intención legislativa.
*Pueblo* v. *Mantilla*, 71 D.P.R. 36, 44–45 (1950). En resumen,
actuó correctamente el tribunal de origen al resolver que las
columnas de los puentes pasquinados por los peticionarios no
constituyen "postes" bajo el Art. 181, *supra.*

### III

Tampoco podemos compartir el criterio de este Tribunal
de que la falta de consentimiento para pasquinar es elemento
esencial que el Estado debe probar.

Ese enfoque es contrario a la doctrina básica imperante.
La misma es sencilla. Frente a la presunción de inocencia
que cobija a todo acusado, "[e]xiste sin embargo otro princi-

pio, aceptado generalmente por los tribunales americanos, al efecto de que *no incumbe al fiscal aducir prueba afirmativa para sostener una alegación negativa cuya veracidad queda razonablemente indicada por las circunstancias establecidas* y que de ser incierta puede fácilmente ser contradicha mediante el ofrecimiento de prueba documental o de otra índole que probablemente está en poder del acusado o bajo su dominio". (Énfasis suplido y citas omitidas.) *Pueblo* v. *Negrón*, 76 D.P.R. 346, 351 (1954).

En el presente caso, la prueba de cargo estableció más allá de duda razonable que los peticionarios ilegalmente pegaron los pasquines en las columnas de los puentes de la Ave. Domenech y la Ave. Iturregui. El Ministerio Fiscal no venía obligado a probar afirmativamente que ellos tenían consentimiento. El estatuto prohibía tal acción, salvo permiso al efecto. En consecuencia, correspondía a los peticionarios sustanciar —en calidad de defensa— que estaban autorizados. *Pueblo ex rel. M.G.R.*, 109 D.P.R. 557, 562 (1980); *Pueblo* v. *Cortés del Castillo*, 86 D.P.R. 220, 235 (1962); *Pueblo* v. *Segarra,* 77 D.P.R. 736, 737 (1954); *Pueblo* v. *Figueroa,* 58 D.P.R. 673 (1941).[2]

## IV

Ahora bien, aunque el foro de instancia no cometió los errores discutidos, las sentencias deben revocarse. Su aplicación contra los peticionarios ha sido discriminatoria por motivos políticos. Ello anula la legalidad de esos dictámenes. Exploremos esta razón de decidir.

La libertad de expresión es derecho fundamental, de forma multidimensional, garantizado en el Art. II, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1. En la constelación

---

[2] Principio reconocido jurisprudencialmente en casos de Ley de Armas y de Ley de Vehículos y Tránsito.

de valores democráticos, la libertad de expresión goza de una primacía peculiar. Todo individuo está en libertad de poder expresar sus opiniones. En el fondo proyecta un interés social comunitario de fomentar la comunicación y el libre intercambio de ideas, y un reconocimiento a "la libertad de conciencia . . . y supone el intento de proteger jurídicamente el libre desenvolvimiento de la personalidad a través de los medios más eficaces y habituales de exteriorización de los contenidos de conciencia". *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 205. En la consecución de este fin, nuestro orden constitucional establece que no se aprobará ley alguna que restrinja la libertad de palabra o de prensa, o el derecho del pueblo a reunirse en asamblea pacífica y a pedir del Gobierno la reparación de agravios.

Sin embargo, este derecho no es absoluto. Puede ser objeto de razonable limitación en atención a otros valores e intereses sociales, también importantes, cuando "la necesidad y conveniencias públicas lo requieran". *Mari Bras* v. *Casañas*, 96 D.P.R. 15, 21 (1968); *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741, 755 (1976); *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975).[3] Así, en la colisión entre el derecho de expresión y el del disfrute pacífico a la propiedad, hemos reconocido que el uso de carteles constituye un ejercicio de la libertad de expresión sujeto a una adecuada limitación para proteger un interés legítimo del Estado. *Mari Bras* v. *Alcaide*, 100 D.P.R. 506, 510 (1976). Este tipo de legislación, además de evitar el abuso por terceros de la propiedad pública y privada —también derechos fundamentales— intenta resguardar como valor social la "seguridad en nuestras carreteras y la preservación del ornato y belleza

---

[3] Igual enfoque prevalece en la jurisdicción federal. *Schenck* v. *United States*, 249 U.S. 47, 52 (1919); *City Council* v. *Taxpayers for Vincent*, 466 U.S. 789 (1984).

del paisaje . . . ." *Cervecería Corona, Inc.* v. *Srio. Obras Públicas,* 97 D.P.R. 44, 56 (1969).

Ahora bien, tales restricciones no pueden anularlo. No podemos perder de vista que pasquinar, al igual que los piquetes, representan mecanismos efectivos de protesta, accesibles a muchos grupos que no pueden utilizar —por resultar muy costosos— los tradicionales medios comerciales de comunicación en masa, a saber, radio, prensa y televisión. Estos "medios técnicos tienen a veces una tendencia monopolista; están controlados por grupos sociales perfectamente definidos, sean estos grupos ajenos al Gobierno o se hayan apoderado también del poder público. En algunos casos poseen con exclusividad los medios de comunicación de masas y eliminan el juego de la libertad de opinión y de palabra, por lo menos en su función social como mecanismo normal de la democracia, pues al lado de las pobres manifestaciones del pensamiento, según la forma tradicional, los nuevos recursos técnicos que poseen en monopolio les permiten 'fabricar' la opinión pública a través de sugestiones y símbolos mejor que a través de ideas y de apreciaciones razonables". *La Nueva Constitución de Puerto Rico, op. cit.,* pág. 212.

Bajo este prisma decisorio, hemos de descartar la tesis de que en este caso estamos ante una legislación cuya clasificación sea sospechosa. No es así. Ciertamente la ley es neutral y se proyecta sin hacer distinción alguna entre personas. *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267 (1975). Aquí el problema estriba en que el discrimen opera en su aplicación selectiva. *Hernández Colón* v. *Srio. de Hacienda,* 115 D.P.R. 145, 152 (1984), opinión disidente.

Los peticionarios demostraron que la ley les ha sido aplicada discriminatoriamente por ser miembros del Partido Socialista Puertorriqueño. A tal efecto, la prueba reveló una clara acción policiaca concertada y coordinada —casi simultánea— en la noche del 27 de junio de 1979, exclusivamente

contra y en ocasión de las actividades del P.S.P. No sólo se produjeron los arrestos en lugares separados tales como las Avenidas Iturregui en Río Piedras y Domenech en Hato Rey, sino a una distante zona geográfica, a saber, el puente que cruza la desembocadura del Río Bayamón en Levittown, el cual tenía adherida propaganda política del Partido Popular Democrático y el Partido Nuevo Progresista. T.E., págs. 122–129. Si bien podría alegarse que las denuncias fueron el resultado normal e ineludible de que sólo el P.S.P. pasquinó esa noche, todos los indicadores objetivos de la prueba descartan el elemento de pura casualidad. Las intervenciones y arrestos no fueron rutinarios. Tanto en el pasado como en el presente, se han centrado únicamente sobre los miembros del P.S.P. y otros independentistas.

El testimonio de *Luis R. Méndez Figueroa* —fotógrafo de la Impresora Nacional— expuso en síntesis que el 15 de septiembre de 1979 tomó varias fotografías cerca del Centro Comercial de Carolina. Éstas, sometidas en evidencia, reflejan un sinnúmero de pasquines y mensajes colocados sobre propiedad pública (puentes y columnas), las cuales anuncian actividades políticas de algunos candidatos del P.P.D. y del P.N.P. T.E., págs. 76–86.

Esta prueba, unida al conocimiento judicial que a solicitud del Procurador General tomamos, sobre "la abundancia de pasquines, carteles y anuncios que tenemos en nuestro país, [y] de que personas afiliadas a otros partidos políticos utilizan el pasquín como medio de comunicación pública, colocándolos en propiedad pública y privada", es suficiente para detectar la aplicación selectiva y discriminatoria de la ley por razones políticas. Curiosamente, en los anales de nuestra jurisprudencia, sólo existen casos penales parecidos contra independentistas. *Mari Bras* v. *Casañas*, supra; *Mari Bras* v. *Alcaide*, supra. La diferencia en trato por motivos ideológicos subsiste. No es la primera vez que judicialmente

así lo hemos concluido. Después de todo, el mensaje independentista específico promovido por el P.S.P. antagoniza a los partidos políticos (P.P.D. y P.N.P.) que propulsan la unión permanente con Estados Unidos. Irónicamente la historia tiende a repetirse. *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403, 414 (1980), opinión disidente.

Esa forma de discrimen es sutil y a veces difícil de precisar y cuantificar. Aun así, en el caso de autos se patentiza con la decisión de enjuiciar y procesar criminalmente sólo a miembros del Partido Socialista Puertorriqueño. Si ello no es prueba de discrimen en la aplicación de la ley, ¿cuál será?

La seriedad del asunto amerita de este foro un claro repudio. Una vez más invitamos a reflexionar sobre las palabras aleccionadoras del filósofo R. Von Ihering: "'la *defensa del derecho es un deber que tenemos para con la sociedad.'* Por eminentes que sean las cualidades intelectuales de un pueblo, si la fuerza moral, la energía, la perseverancia, le faltan, en ese pueblo jamás podrá prosperar el derecho. Cuando la arbitrariedad, la ilegalidad, osan levantar afrentosamente su cabeza, se puede siempre reconocer en este signo, que los que están llamados a defender la ley no cumplen con su deber. Desde el momento en que el derecho no está dispuesto a luchar se sacrifica. Así podremos aplicarle la sentencia del poeta: '*Es la última palabra de la sabiduría; Que sólo merece la libertad y la vida; El que cada día sabe conquistarlas.*' Citado por O. Maurín Navarro, *Libertad de Asociación*, Argentina, Ed. Sanjuarina, 1967, pág. 17." (Énfasis en el original.) *Hernández Colón* v. *Srio. de Hacienda*, supra, pág. 152.

En las circunstancias apuntadas el único mandato judicial capaz de reivindicar el discrimen constitucional político e ideológico es la revocación de las sentencias condenatorias.

—O—

Voto concurrente emitido por el Juez Presidente Señor Pons Núñez.

I

A los peticionarios en el caso de autos se les denunció, imputándoles que el 27 de junio de 1979, ilegal, voluntariamente y de común acuerdo pegaron pasquines sobre las columnas de varios puentes del área metropolitana. Los pasquines a exhibirse tenían el mensaje siguiente: "Panamericanos 79, Bienvenidos, Partido Socialista Puertorriqueño." Ilustraba la bandera de Estados Unidos arriada y la de Puerto Rico al tope del asta. Los peticionarios fueron encontrados culpables por el Tribunal de Distrito de violar el Art. 181 del Código Penal de 1974, según enmendado, 33 L.P.R.A. sec. 4287, el cual, en su parte pertinente, dispone:

> Toda persona que pegare, fijare, imprimiere, o pintare sobre propiedad pública, *excepto en postes*, o sobre cualquier propiedad privada, *sin el consentimiento del custodio, dueño o encargado*, cualquier aviso, anuncio, letrero, cartel, grabado, pasquín, cuadro, mote, escrito, dibujo, figura o cualquier otro medio similar, no importa el asunto, artículo, persona, actividad, tema, concepto o materia a que se haga referencia en los mismos, será sancionada con multa mínima de cincuenta (50) dólares y máxima de doscientos cincuenta (250) dólares. (Énfasis nuestro.)

Se les sentenció a pagar una multa de cincuenta ($50) dólares cada uno o, en su defecto, un día de cárcel por cada cinco ($5) dólares que dejaran de satisfacer. De esta sentencia se apeló ante el Tribunal Superior de San Juan, el cual confirmó al Tribunal de Distrito. De la determinación del Tribunal Superior se ha recurrido ante este Foro.

## II

La excepción a la prohibición de fijar pasquines en postes y el elemento de consentimiento del custodio fueron incluidos en el Art. 181 del Código Penal, *supra*, mediante la Ley Núm. 4 de 13 de junio de 1976; ello luego de nuestra decisión en el caso de *Mari Bras* v. *Alcaide*, 100 D.P.R. 506 (1972), en el cual señalamos que la práctica de fijar carteles, pasquines, etc., es un medio de difusión de ideas que constituye un ejercicio de la libertad de expresión. En la exposición de motivos de la Ley Núm. 4, *supra*, se señaló que el ornato de nuestras ciudades y pueblos reviste un interés vital para la paz y convivencia en nuestro país. Por tal razón, para aminorar el problema que representa la fijación indiscriminada de carteles, pasquines, etc., en la estética y ornato público, el legislador aprobó esta ley como parte de un programa de gobierno dirigido a armonizar los intereses de expresión con los de convivencia social. Explica el legislador que el elemento central de la medida legislativa es permitir a los custodios, dueños o encargados de propiedades públicas y privadas ejercer su consentimiento a la fijación de carteles, pasquines, etc., en sus propiedades.

Como puede observarse, el propósito del Art. 181 del Código Penal, *supra*, no fue limitar el derecho a la libertad de expresión, sino armonizar éste con el interés vital que representa el ornato de nuestras ciudades y pueblos.[1]

---

[1] El esfuerzo legislativo por fomentar y preservar el ornato y la belleza natural del paisaje se evidencia desde principios de siglo con la Ley Núm. 55 de 10 de marzo de 1910 (10 L.P.R.A. secs. 313–320). Esta legislación, dirigida a la promoción comercial, prohibió la fijación de carteles, letreros, anuncios, etc., en propiedades pertenecientes al Estado Libre Asociado de Puerto Rico o sujeta a servidumbre a favor de éste; reglamentó los anuncios y rótulos instalados en edificios comerciales y declaró delito menos grave cualquier infracción a la misma.

Posteriormente, en la legislación sobre Construcción y Conservación de Carreteras, Ley Núm. 427 de 13 de mayo de 1951, luego enmendada por la Ley

## III

La estética, como interés social importante y creciente para la consecución del bienestar general, es por sí sola fundamento válido para el ejercicio del poder del Estado.[2] No obstante, cuando se enfrenta a un derecho de rango constitucional, el Estado tiene la obligación de viabilizar de una manera plena y efectiva la realización de éste.

La Carta de Derechos de nuestra Constitución, Art. II, Sec. 4, L.P.R.A., Tomo 1, ed. 1982, pág. 265, dispone:

> No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios.

Asimismo la Constitución de Estados Unidos de América en su enmienda primera preceptúa:

> Congress shall make no law respecting an establishment religion, or prohibiting the free excercise thereof, or abridging the freedom of speech, or of the press . . . .

Un estatuto que intente restringir, dificultar o prohibir el disfrute de derechos constitucionalmente protegidos, como lo es el derecho a la libre expresión, debe estar fundamentado en un interés público apremiante; su efecto y alcance no debe ser más amplio del necesario para lograr un propósito legítimo y conveniente según expresado por el legislador. *Pueblo* v. *Hernández Colón*, 118 D.P.R. 891 (1987); *Rodríguez* v. *Srio. de Instrucción*, 109 D.P.R. 251, 255–256 (1979); *Mari Bras* v. *Casañas*, 96 D.P.R. 15, 23 esc. 9 (1968); *Pueblo* v. *Burgos*, 75 D.P.R. 551, 570 (1953).

---

Núm. 62 de 13 de junio de 1977, también se hizo sentir la preocupación legislativa sobre la instalación de anuncios en las carreteras. 9 L.P.R.A. sec. 32.

No pasamos aquí juicio sobre dicha legislación.

(2) *Berman* v. *Parker*, 348 U.S. 26 (1954); *Cervecería Corona, Inc.* v. *Srio. de Obras Públicas*, 97 D.P.R. 44, 48 (1969).

## IV

Con el propósito de lograr un balance entre el valor estético y el derecho a la libertad de expresión, el legislador delegó en los custodios de propiedades públicas y privadas la facultad para consentir a la fijación de carteles, pasquines, etc. Al proveer esta vía del previo consentimiento, debe entenderse que el legislador visualizó que existen lugares, en adición a los postes, en los cuales pueden fijarse carteles y pasquines sin afectar adversamente el interés que desea proteger el Estado. El Secretario del Departamento de Transportación y Obras Públicas (D.T.O.P.), como custodio de las propiedades estaduales por disposición de ley,[3] es la persona llamada a consentir y a quien el cuerpo legislativo delegó la facultad y obligación de hacerlo en cuanto a propiedad pública se refiere.

La delegación de poderes cuasi legislativos y cuasi judiciales en agencias administrativas no se cuestiona, siempre y cuando contenga normas adecuadas que sirvan de guía y limiten el uso del poder conferido. *López* v. *Junta Planificación*, 80 D.P.R. 646, 661 (1958); *Hilton Hotels* v. *Junta Salario Mínimo*, 74 D.P.R. 670, 692–693 (1953); *Torres Arzola* v. *Policía de P.R.*, 117 D.P.R. 204 (1986); *M.&B.S., Inc.* v. *Depto. de Agricultura*, 118 D.P.R. 319 (1987). El propósito de esta delegación de poderes es que la agencia lleve a cabo una tarea específica con flexibilidad y con el conocimiento especializado (*expertise*). Por la complejidad del mandato otorgado a estas agencias administrativas, ha sido necesario que la Rama Legislativa les delegue poderes con normas amplias y generales permitiéndoles gran discreción en el desarrollo y ejecución de la política pública. *López* v. *Junta Planificación*, supra; *Torres Arzola* v. *Policía de P.R.*, supra. No

---

(3) Código Político de 1902, Art. 133 (3 L.P.R.A. sec. 411).

obstante, "[c]uando las leyes habilitadoras de las agencias del Gobierno contienen normas amplias y generales es deseable que a través de la promulgación de reglamentos se definan los contornos y el alcance de sus poderes. Una vez el organismo administrativo ha definido los contornos de su acción a través de reglamentos debidamente promulgados, le corresponde aplicarlos celosamente". *Torres Arzola* v. *Policía de P.R.*, supra, pág. 211.

El Art. 181 del Código Penal, *supra*, provee el recurso del previo consentimiento pero no define este término. Obviamente, el consentimiento a que se refiere el legislador (en cuanto a propiedad estadual) no puede ser concedido caso por caso. "[E]l ejercicio de poderes administrativos a base de consideraciones caso por caso, no a base de una ley o de un reglamento, adolece del defecto constitucional de ambigüedad. . . ." *Soto* v. *Srio. de Justicia*, 112 D.P.R. 477, 499 (1982); *Pennsylvania State Board of Pharmacy* v. *Cohen*, 292 A.2d 277, 282 (1972); K.C. Davis, *Administrative Law Treatise*, 2da ed., 1978, Vol. I, págs. 181–182.

Cuando la norma estatutaria que delega facultades es imprecisa, la agencia deberá formular una reglamentación que guíe las determinaciones administrativas para así evitar actuaciones arbitrarias y posiblemente discriminatorias.[4] "La aprobación de reglamentos a su vez facilitará la revisión judicial, especialmente en aquellas áreas donde el ámbito de discreción es excesivo." *Torres Arzola* v. *Policía de P.R.*, supra, pág. 211.

Al momento de los hechos que dan lugar al caso de autos (y hasta el día de hoy), el Secretario del D.T.O.P. no había reglamentado el ejercicio de la facultad para consentir que le

---

[4] De los hechos debidamente probados en el caso de autos no puede deducirse razonablemente que se ha implantado discriminatoriamente el Art. 181 del Código Penal, 33 L.P.R.A. sec. 4287, pero ciertamente podría darse tal situación. Véase K.C. Davis, *A New Approach to Delegation*, 36 U. Chi. L. Rev. 713 (1969).

delegó el legislador. Esta ausencia de reglamentación tiene como consecuencia que los ciudadanos no puedan determinar en qué otras propiedades públicas se pueden fijar carteles y pasquines sin incurrir en una violación al Art. 181 del Código Penal, *supra*.

La omisión de reglamentar, por parte del Secretario del D.T.O.P., tiene como secuela que el referido artículo penal tenga un alcance más amplio de lo necesario para llevar a cabo el propósito legislativo de lograr la estética y el ornato. Ante la restricción del disfrute del derecho de libertad de expresión, el Estado no ha provisto alternativas razonables que viabilicen de manera efectiva la realización del mismo.

Para resumir: la ausencia de reglamentación por parte del custodio de la propiedad estadual tiene el efecto de eliminar la alternativa que proveyó la Asamblea Legislativa para no coartar indebidamente el derecho constitucionalmente protegido de la libertad de expresión. Por tales razones, no puede darse vigencia a las disposiciones del Art. 181 del Código Penal, *supra*, hasta tanto se actúe legislativamente o la agencia administrativa elimine el defecto de vaguedad a través de una reglamentación adecuada.(5)

En consideración a lo antes expuesto, concurro en que deben revocarse las sentencias condenatorias ante nuestra consideración.

---

(5) Aun cuando podría determinarse razonablemente por el Secretario del Departamento de Transportación y Obras Públicas que las columnas de los puentes son unas de esas propiedades en las cuales, en el ejercicio de la libre expresión, pueden fijarse carteles y pasquines sin violentar el interés que pretende proteger el Estado, en este caso, a la luz del historial legislativo, no podemos suscribir la tesis de que el vocablo "postes" comprende las columnas de los puentes.