Opinión de conformidad emitida por
el Juez Asociado Se-ñor Kolthoff Caraballo,
a la cual se unen el Juez Aso-ciado Señor Martínez Torres y la Jueza Asociada Señora Pabón Charneco.
Estoy conforme con la Sentencia emitida hoy, en tanto confirma el dictamen del Tribunal de Apelaciones, Región Judicial de Caguas. Este dictamen sostuvo que el Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica (Ley Núm. 54), 8 L.P.R.A. sec. 631, no aplica a un incidente de violencia dentro de una relación adulterina.
Al expresar mi conformidad pesa en mi ánimo no sólo el estar convencido que la sentencia del Tribunal de Apelacio-nes se ajusta a los principios del derecho penal puertorri-queño, sino, además, que la mujer víctima de esta alegada agresión no quedará desprovista de protección. Como deta-llamos más adelante, la víctima cuenta con remedios aná-logos para proteger su vida e integridad, y hacerle final-mente justicia. Como señalamos en Pueblo v. Ruiz, 159 D.P.R. 194, 213 esc. 20 (2003):
La persona agredida no queda desprovista de protección aunque no aplique la Ley Num. 54, supra, no solamente por que la conducta imputada puede constituir un delito bajo el *230 Código Penal, sino porque también podrían aplicar los Arts. 4 y 5 de la Ley Núm. 284 de 21 de agosto de 1999 (33 L.P.R.A. secs. 4014 y 4015), [Ley contra el Acecho en Puerto Rico,] que establecen un mecanismo de órdenes protectoras contra toda persona que intencionalmente manifieste un patrón de con-ducta persistente de acecho dirigido a intimidar a otra persona.
Repasemos brevemente los hechos que originan la controversia.
I
Contra el Sr. José Miguel Flores Flores (acusado) se pre-sentó una denuncia por infracción al Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica, supra. A este se le imputó haber empleado maltrato físico contra la Sra. Carmen M. Romero Pérez (peijudicada), persona con la cual, alegadamente, cohabitaba y sostenía una relación consensual.
Así, se celebró una oportuna vista preliminar en la que se determinó causa probable para acusar, por lo que se presentó la acusación correspondiente. Posteriormente, el acusado presentó una moción al amparo de la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, en la que alegó la ausencia total de prueba respecto al delito que se le imputó debido a que la relación que sostenía o sostuvo con la perjudicada no estaba contemplada por la Ley Núm. 54. Ello, porque los actos imputados se produjeron dentro de una relación adulterina. El Ministerio Público se opuso a lo solicitado y sostuvo que la relación entre el acusado y la peijudicada era la de una pareja y en la que incluso se sostuvieron relaciones sexuales. Además, alegó que el De-recho vigente no exigía ningún requisito en cuanto al es-tado civil del acusado o de la perjudicada para la aplicación del artículo en cuestión.
Tras realizar el examen de rigor, el Tribunal de Primera Instancia determinó que no existía tal ausencia total de *231 prueba, por lo cual, declaró “no ha lugar” la moción de desestimación. Luego de la denegatoria de las solicitudes de reconsideración, el acusado acudió al Tribunal de Ape-laciones, el cual revocó. El foro apelativo intermedio sos-tuvo, conforme al historial legislativo de la Ley Núm. 54 y al principio de legalidad, que en el presente caso no se configuraron todos los elementos del delito imputado. En vista de ello, el Tribunal de Apelaciones desestimó la acusación. De esta decisión recurre el Procurador General.
Veamos la normativa aplicable a la controversia que hoy atendemos.
II
A. De entrada, debemos ser conscientes que la Ley Núm. 54 es un estatuto con disposiciones de carácter penal. Por consiguiente, al ejercer nuestra función de in-terpretar dicho estatuto, no debemos perder de perspectiva los principios generales del derecho penal que limitan tal función. Entre estos se encuentra el principio de legalidad.
El principio de legalidad es una exigencia de seguridad jurídica que requiere el conocimiento previo de los delitos y sus penas, y además es una garantía política que protege al ciudadano de verse sometido por parte del Estado a pe-nas que no admita el Pueblo.(1) El propósito principal de este principio es limitar las aplicaciones arbitrarias y ca-prichosas de los estatutos penales.(2) Asimismo, el princi-pio de legalidad salvaguarda la separación de poderes al reconocerle solo a la Asamblea Legislativa la legitimidad para criminalizar una conducta.(3) De igual forma, se en-tiende que este principio fomenta la prevención general y *232 fundamenta el principio de culpabilidad.(4) Lo anterior se sustenta en que no puede hablarse de culpabilidad ni de motivar a una persona a actuar conforme a derecho si la conducta no estaba prohibida al momento de los hechos.(5)
En Puerto Rico, el principio de legalidad está recogido específicamente en el Art. 2 del Código Penal, el cual dis-pone que
[n]o se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito en este Código o mediante ley especial, ni se impondrá pena o medida de seguridad que la ley no establezca con anterioridad a los hechos.(6)
De esta forma, se prohíbe instar una acción penal por un hecho que no está expresamente definido como delito, así como imponer penas o medidas de seguridad que no estén establecidas por la ley con anterioridad a los hechos. Con ello, se pretende que la Asamblea Legislativa sea la que defina lo que constituye una conducta delictiva y sus respectivas penas.(7) Así, se elimina la posibilidad de crear delitos a través de la jurisprudencia o el Derecho consuetudinario.(8) Es principio reiterado que los tribuna-les no tienen la autoridad “para considerar como constitu-tivos de delito hechos distintos a los consignados en la ley, ni imponer sanciones no previstas en la misma”. (Enfasis suprimido.)(9)
Por su parte, se ha establecido claramente que, con-forme al principio de legalidad, lo importante es que una persona común y corriente, que carezca de conocimientos legales, pueda comprender razonablemente lo que se *233 prohíbe. (10) “No se satisface el fundamental principio de le-galidad, si para conocer lo que está vedado es necesario un esfuerzo hermenéutico propio de juristas.(11)
Cónsono con lo anterior, el Art. 3 del Código Penal esta-blece la prohibición de crear delitos o imponer penas o me-didas de seguridad por analogía. (12) Conforme a esta prohi-bición, “el juez está impedido de penalizar por un hecho no tipificado como delito por su semejanza con uno tipificado como tal; o admitir un agravante o una gradación especí-fica no enumerada, basándose en sus semejanzas con una enumerada; o imponer una pena no contemplada por la ley por su analogía con una prevista en la ley".(13) En este contexto, al analizar la prohibición de analogía, en Pueblo v. Bonilla, 148 D.P.R. 486, 503 (1999), expresamos que
[l]a analogía conlleva aplicar la ley a unos hechos o situacio-nes no considerados en determinada ley, porque son semejan-tes o parecidos a los allí dispuestos. Al aplicar la analogía, el juez suple la voluntad del legislador, la cual no existe para los hechos que tiene ante sí, basado en su semejanza a los hechos sí tipificados.
Como toda ley, las leyes penales están sujetas a interpretación. Sin embargo, la diferencia entre la inter-pretación (permitida si es razonable) y la analogía (prohi-bida en lo que perjudica al acusado) estriba en lo siguiente: la interpretación busca un sentido en el texto de la ley que se enmarque en su “sentido literal posible” y la analogía supone la aplicación de la ley penal a un supuesto que no está comprendido en ninguno de los sentidos posibles de su letra, pero análogo a otros en el texto legal.(14)
Ahora bien, uno de los fundamentos principales de la hermenéutica legal es que siempre “debe describirse y ha- *234 cerse cumplir la verdadera intención y deseo del poder legislativo”.(15) Incluso, en ocasiones debemos suplir las po-sibles deficiencias presentes en las leyes, a través de una interpretación en la que analicemos la ley como un ente armónico y lógico.(16) Sin embargo, en el campo penal el proceso de hermenéutica legal es limitado. La interpreta-ción de los estatutos penales debe ser restrictiva en lo que desfavorece al acusado y liberal en lo que le favorece.(17)
Por ello, cuando existen dudas en torno al alcance o sen-tido de una disposición penal, los tribunales debemos acla-rar dicho sentido o alcance. Lo anterior no significa que podemos darle a una ley un significado más limitado al que usualmente tiene dentro de la realidad social.(18) No obs-tante, tampoco significa que debemos ignorar la clara in-tención legislativa.(19) “[NJinguna regla de interpretación —ni siquiera la de interpretación restrictiva de los estatu-tos penales— debe derrotar el propósito que la legislación persigue”.(20) Así, la interpretación restrictiva aplicable a los estatutos penales se hará sin menoscabo de la intención legislativa conocida o evidente.(21)
En ese ejercicio de interpretación, y cónsono con lo antes expuesto, cabe señalar lo que dispone el Art. 13 del Código Penal sobre esta materia:
Las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente.
Si el lenguaje empleado es susceptible de dos o más inter-pretaciones, debe ser interpretado para adelantar los propósi-tos de este Código y del artículo particular objeto de interpretación. 33 L.P.R.A. sec. 4641.
*235 Claramente, el precepto anterior requiere que las dispo-siciones del Código Penal se interpreten conforme a la vo-luntad del legislador. De igual forma, al examinar los esta-tutos penales en el ejercicio de nuestra función de interpretar las leyes, debemos considerar la realidad social de donde surgen y operan.(22) Sin embargo, tal y como ex-presa el Prof. Luis E. Chiesa Aponte, “cuando de interpre-tar textos jurídicos se trata, los límites no están principal-mente dictados por el sentido ordinario del lenguaje, sino por la comunidad interpretativa a la cual pertenece el juzgador”.(23) Por consiguiente, “las interpretaciones de las leyes penales son válidas siempre y cuando sean previsi-bles a la luz de la normativa vigente previo a realizarse la interpretación”.(24)
B. La violencia doméstica es uno de los problemas más graves y complicados que enfrenta nuestra sociedad. Aun-que generalmente se le utiliza en referencia a la violencia contra la mujer, este concepto es más amplio. Se entiende que la violencia doméstica incluye los actos de violencia intrafamiliar, siendo los niños y las mujeres los más afectados.(25) Por esto, en términos generales, el concepto se refiere a la “violencia entre personas que participan del mismo núcleo familiar y, en la mayor parte de los casos, comparten una misma unidad de vivienda”.(26)
En Puerto Rico, luego de largas luchas y múltiples es-fuerzos, la Asamblea Legislativa aprobó la ley que busca prevenir e intervenir con la violencia doméstica. Por consi-guiente, la Ley Núm. 54, conocida como Ley para la Pre-vención e Intervención con la Violencia Doméstica, es el *236 estatuto que refleja la política pública del Gobierno en torno a este grave problema. En esencia, la Ley Núm. 54 estableció un sistema más ágil y sencillo para la protección de las víctimas a través de la expedición de órdenes de protección. También incorporó elementos de autoayuda que procuran estimular a las víctimas de violencia domés-tica a solicitar remedios legales provisionales e inmediatos por sí mismas. Además, la ley tipifica el delito de maltrato en diversas modalidades y sus respectivas penalidades, las cuales son mayores en caso de reincidencia y ante circuns-tancias agravantes. Asimismo, establece medidas para la intervención de la policía, como el arresto mandatorio, la responsabilidad de proveer asistencia a la víctima y de re-copilar información sobre la violencia doméstica. Todas es-tas medidas tienen el propósito de “atender las áreas fun-damentales que requieren solución inmediata para ejecutar la política pública de combatir la criminalidad y brindar alternativas de esperanza a la familia puertorriqueña”.(27)
No obstante, en el contexto particular de la Ley Núm. 54, la violencia doméstica es definida como
... un patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona por parte de su cónyuge, ex cónyuge, una persona con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una persona con quien se haya procreado una hija o un hijo, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional.(28)
Es decir, contrario al concepto amplio de la violencia doméstica, nuestra legislación se limitó a la violencia en el ámbito conyugal o entre parejas o exparejas. En conse-cuencia, para poder comprender con claridad los alcances *237 de esta ley en las diversas relaciones de pareja que abarca, es necesario referirnos no sólo a sus disposiciones, sino también a la intención legislativa. Por tal razón, para resolver la controversia ante esta Curia es necesario inter-pretar la Ley Núm. 54 y, por ende, es preciso comprender la política pública que le subyace.
Precisamente, el Art. 1.2 de la ley, 8 L.P.R.A. see. 601, expone esa política pública de la forma siguiente:
El Gobierno de Puerto Rico reconoce que la violencia domés-tica es uno de los problemas más graves y complejos que con-fronta nuestra sociedad. En el desarrollo de la política sobre este asunto, debemos dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, particu-larmente a mujeres y menores, para preservar su integridad física y emocional, procurar su seguridad y salvar sus vidas.
La violencia doméstica es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres. Las ideas, actitudes y conductas discrimi-natorias también permean las instituciones sociales llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados.
El Gobierno de Puerto Rico se reafirma en su compromiso constitucional de proteger la vida, la seguridad y la dignidad de hombres y mujeres. Además, reconoce que la violencia do-méstica atenta contra la integridad misma de la familia y de sus miembros y constituye una seria amenaza a la estabilidad y a la preservación de la convivencia civilizada de nuestro pueblo.
Como política pública, el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere man-tener para los individuos, las familias y la comunidad en general. A través de esta política pública se propicia el desa-rrollo, establecimiento y fortalecimiento de remedios eficaces para ofrecer protección y ayuda a las víctimas, alternativas para la rehabilitación de los ofensores y estrategias para la prevención de la violencia doméstica.
Claramente, la política pública expuesta presta especial atención a la violencia contra las mujeres, ya que son ellas quienes más han sufrido los embates de la desigualdad so *238 cial, las relaciones de poder y el resquebrajo de un hogar seguro. Sin embargo, aunque la violencia doméstica afecta principalmente a las mujeres, la legislación fue finalmente aprobada con un lenguaje neutral. Es decir, la política pú-blica del Estado está dirigida a preservar la integridad fí-sica y emocional de la mujer y el hombre en sus relaciones de pareja.(29) Así, al examinar la política pública expuesta en la Ley Núm. 54 es evidente que esta se fundamenta en el sentido máximo de proteger la vida, la seguridad y la dignidad de los hombres y las mujeres.
Ahora bien, esa política pública también resalta la im-portancia que tiene el núcleo familiar en la legislación contra la violencia doméstica. En esta se reconoció que dicha violencia “atenta contra la integridad misma de la familia”.(30) Además, se reconoció expresamente que como política pública, “el Gobierno de Puerto Rico repudia enér-gicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general”.(31)
El historial legislativo de la Ley Núm. 54 refleja que el interés principal del Estado fue la tipificación del delito de maltrato conyugal, aunque finalmente este estatuto ter-minó aprobándose con un lenguaje que protege varios tipos de relaciones.(32) No obstante, de dicho historial surge el claro deseo legislativo de proteger la integridad misma de la familia y sus miembros. Por ejemplo, se señaló que la violencia doméstica constituye un serio problema para la familia puertorriqueña, ya que “[s]e trata de violencia en-tre personas que participan del núcleo familiar y compar- *239 ten la unidad de vivienda”.(33) Lo anterior es cónsono con las expresiones vertidas por la entonces Directora Ejecutiva de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador, en su informe ante las comisiones legislativas que estudiaron dicha legislación. En ese informe se expresó que:
Más allá de los efectos que el maltrato pueda tener directa-mente sobre la víctima, todos los estudios consultados indican que tiene efectos sumamente detrimentales sobre los niños y niñas y sobre la familia en general. Los niños y niñas que viven en hogares violentos aprenden la conducta violenta como aprenden cualquier otro tipo de comportamiento. Reci-ben el mensaje de que la violencia es un mecanismo normal para resolver conflictos y para tratar a las demás personas.(34)
Además, al citar con aprobación un informe del Procu-rador de Estados Unidos se señaló que “[l]a familia es la unidad fundamental sobre la que se construye la sociedad”.(35) Así, pues, el legislador tomó como referencia no solo la violencia intrafamiliar y el maltrato conyugal, sino los efectos y las consecuencias de dicha violencia en el seno familiar.(36)
Por tal razón, al aprobar la Ley Núm. 54, nuestra Asam-blea Legislativa expresó diáfanamente que la violencia do-méstica es un elemento dañino a nuestra sociedad, en especial a la institución familiar.(37) Precisamente, en su Exposición de Motivos la Ley Núm. 54 dispone que “[l]a violencia doméstica es un comportamiento antisocial que constituye un serio problema para la familia *240 puertorriqueña”.(38) Ello, porque todos los componentes de esta pueden ser víctimas de la violencia en el ámbito familiar. De manera que, aunque las mujeres usualmente son las víctimas principales de dicha violencia, lo anterior no solo afecta a la mujer o al hombre, según sea el caso, sino que afecta directamente a los hijos y consecuente-mente a la institución familiar. A tales efectos, el legislador señaló que “[tjolerar la violencia doméstica hoy, contribuye a la desintegración de la familia, a fomentar la criminalidad y al debilitamiento de los valores de la convivencia humana”.(39) Por tal razón, hemos reconocido que la polí-tica pública enunciada en la Ley Núm. 54 tiene como pro-pósito cardinal el “fortalecer la institución de la familia, que se visualiza como una política que surge y se ampara en la unión sentimental y legal entre un hombre y una mujer”.(40)
C. El Art. 3.1 de la Ley Núm. 54, supra, tipifica el de-lito de maltrato de la manera siguiente:
Toda persona que empleare fuerza física o violencia psicoló-gica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una rela-ción consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privati-vamente al ofensor, o a la persona de otro o para causarle grave daño emocional ....
Del citado artículo se desprende que este es aplicable a las relaciones afectivas entre cónyuges, excónyuges, perso-nas que cohabiten o hayan cohabitado, que sostengan o sostuviesen una relación consensual o entre personas con quien se haya procreado un hijo o una hija. En torno a las *241 primeras dos relaciones, claramente ambas se sustentan en la figura del matrimonio. Esto es, la disposición le es aplicable a la relación entre esposa y esposo (los cónyuges) y a la que subsiste entre aquellos que estuvieron casados en algún momento (los excónyuges). Por su parte, el artí-culo también hace mención de la relación entre personas que cohabitan o hayan cohabitado. En ese sentido la ley define “cohabitar” como “sostener una relación consensual similar a la de los cónyuges”.(41) En otras palabras, como ya este Tribunal ha reconocido, lo anterior se refiere al concubinato.(42)
En cuanto a la expresión “relación consensual”, esta no estuvo en los proyectos originales y fue añadida al final del proceso. En el caso Pueblo v. Ruiz, supra, tuvimos la opor-tunidad de interpretarla. En esa ocasión determinamos que dicha expresión no incluía a las parejas del mismo sexo, por lo que concluimos que la Ley Núm. 54 solo aplica a relaciones de parejas heterosexuales. No obstante, al in-terpretar lo que es una relación consensual según la ley, sostuvimos que esta incluye a aquellas parejas compuestas por un hombre y una mujer que aunque no necesariamente cohabitan, llevan una relación afectiva-consensual.(43) Lo anterior fue ejemplificado con la exposición de la relación amorosa íntima que pudieran llevar unos novios que no conviven.(44) Ello, porque tal interpretación es cónsona con “la política pública a favor de la familia, ya que en estas relaciones muchas veces se tienen hijos en común, además de que en algunas ocasiones suponen un eventual matrimonio”.(45) Por tal razón, podemos decir que el legis-lador distinguió entre la relación consensual en la que la *242 pareja convive, la que llamó cohabitar, y la mera relación consensual, en la que no es necesario que la pareja viva bajo el mismo techo.
Ahora bien, es evidente que el artículo aquí en cuestión protege una serie de relaciones que trascienden el vínculo matrimonial. No obstante, el hecho de que se trascienda el vínculo matrimonial no significa que el legislador quiso in-cluir y proteger las relaciones adulterinas. Resulta claro del historial legislativo que el propósito de la Ley Núm. 54 es atender el maltrato y la violencia en el contexto familiar, ya sea entre cónyuges o entre los que cohabitan, o entre aquellos que fueron cónyuges o mantienen una relación consensual. Incluso aplica a aquellos que sin cohabitar o mantener una relación consensual procrearon un hijo en-tre sí. Sin embargo, nótese que la propia ley atiende asun-tos de custodia de menores, alimentos para menores, domi-cilio de la pareja y las pertenencias personales, por lo que expresamente el legislador mantuvo siempre una clara tendencia a la protección del contexto familiar.
Por su parte, el Art. 130 del Código Penal de Puerto Rico dispone que cuando una persona casada tiene relaciones sexuales con una persona que no sea su cónyuge incurrirá en el delito de adulterio.(46) Además, si ese delito “se comete por una mujer casada y un hombre soltero, o un hombre casado y una mujer soltera, el hombre soltero o la mujer soltera incurrirá en el delito de adulterio”.(47) Este delito es análogo al Art. 129 del derogado Código Penal de 1974. Respecto a esto, la doctora Nevares-Muñiz señala que, “el legislador decidió mantener el delito en el Código Penal en protección a la unidad familiar y en su redacción incluyó los elementos que existían desde el Código de 1902 derogado”.(48) Por consiguiente, es evidente que por déca- *243 das las relaciones adulterinas han sido ilegales en nuestra jurisdicción. Así lo dispuso nuestra Asamblea Legislativa.
La Ley Núm. 54 sólo hace mención del adulterio en las disposiciones sobre el desvío del procedimiento. Específica-mente, el Art. 3.6 señala “que en el caso del delito de agre-sión sexual conyugal, el desvío del procedimiento sólo es-tará disponible para los casos en que el acusado sea el cónyuge o cohabite con la víctima al momento de la agre-sión sexual, siempre y cuando dicha cohabitación no sea adúltera ...”.(49) De esta forma, el legislador sólo mencionó las relaciones adulterinas para expresar claramente la inaplicabilidad de un beneficio de desvío. En ninguna otra parte del texto legal existe otra mención a las relaciones adulterinas.
III
En el presente caso, se alegó que el Sr. José Miguel Plo-res Flores golpeó a la Sra. Carmen M. Romero Pérez y por tal actuación se le imputó haber infringido el Art. 3.1 de la Ley Núm. 54, supra. Ello, porque alegadamente estos co-habitaban y sostenían una relación consensual. No obs-tante, surge del expediente que la señora Romero Pérez declaró en la Vista Preliminar que la relación que ellos llevaban era como de “novios” y en la que llegaron a soste-ner relaciones sexuales. Además, que simultáneamente a dicha relación afectiva, esta se encontraba legalmente ca-sada con otro hombre.
Ahora bien, no surge del expediente que el señor Flores Flores conviviera con la peijudicada, por lo que no se puede sostener que estos cohabitaban. Lo anterior, no fue negado por ninguno de estos. El señor Flores Flores y la peijudi-cada sostenían conscientemente una relación adulterina. Así, pues, nos corresponde determinar si la relación entre *244 ambos constituyó una relación consensual para fines de la legislación en cuestión y si ésta, a su vez, es aplicable a una relación adulterina.
Al examinar el historial legislativo de la Ley Núm. 54 resulta evidente que ese estatuto está dirigido a la inter-vención y prevención de la violencia en las relaciones de pareja en el contexto familiar. Surge con claridad el deseo legislativo de proteger la integridad misma de la familia y sus miembros. El Art. 3.1 de la Ley Núm. 54, supra, dis-pone su aplicación a las relaciones de pareja en el contexto familiar: cónyuges, excónyuge y aquellos que cohabitan. Además, tal es el fundamento familiar que incluso aplica a aquellos que, aunque no les apliquen ninguna de estas ca-tegorías ni mantengan una relación consensual, hayan procreado un hijo en común. Ello es así, ya que existiría un derecho de relaciones paterno-filiales de ese hijo que los vinculará por el resto de sus vidas. Cabe señalar, y aten-diendo la inquietud de la opinión disidente de la compa-ñera Jueza Asociada Señora Fiol Matta, que ante la clara intención legislativa en pro de la institución familiar y el bienestar de sus miembros, en el caso de que se procree un hijo en el seno de una relación adulterina, sí la ley le sería aplicable. La protección no adviene por la relación estar enmarcada en una de índole consensual o de cohabitación, sino, por el hecho de que hayan procreado un hijo. Ello, es cónsono con el interés del Estado de proteger a los hijos de la violencia entre sus padres. Lo anterior, es claramente sustentable al examinar la intención legislativa de la Ley Núm. 54. Además, cónsono con el referido contexto expre-samos que en el caso de la relación consensual esta puede entenderse por la de los novios que sin convivir pueden llegar a mantener una relación afectiva. (50)
Sin embargo, de los diferentes tipos de pareja a los que el Art. 3.1 de la Ley Núm. 54, supra, hace mención, no encontramos un mandato expreso del legislador que in- *245 cluya las relaciones adulterinas. Ello es importante porque no debemos perder de perspectiva que estamos ante un estatuto con disposiciones penales, por lo que tenemos que abordarlo restrictivamente conforme al principio de legalidad. Contrario a la postura del Procurador General, no podemos interpretar el referido artículo de forma ex-pansiva y hacer de la definición de pareja una enumeración numerus apertus.
Entre los principios esenciales del derecho penal está el que nos impide crear delitos por analogías, por ende, no podemos crear elementos de un delito que no han sido con-siderados por el legislador. En nuestro sistema de go-bierno, la Legislatura, como representante del pueblo, es la única que está legitimada para criminalizar una conducta. Aunque es correcto que la Ley Núm. 54 está enfocada en la víctima, ello no puede utilizarse como subterfugio para crear los elementos de un delito por analogía y violar el debido proceso de ley.
En Puerto Rico las relaciones adulterinas son clara-mente penalizadas en el Código Penal. Mas aún, es evi-dente que la Asamblea Legislativa ha identificado el adul-terio como un mal social y destructor de nuestra familia al punto que lo ha mantenido como delito reiteradamente por más de un siglo. Por ende, ante tal realidad, para poder establecer que esa misma Asamblea Legislativa que ha in-sistido en combatir este mal social, ahora lo pasa por alto en los casos de violencia doméstica, es necesario que suija claramente del texto de la ley. No obstante, esto no es así. Ni de su faz ni de su historial surge lo sostenido por el Procurador General. Por consiguiente, sin un claro man-dato legislativo, no podemos expandir la definición de “re-lación consensual” para abarcar relaciones que son ilegales en nuestra jurisdicción.
Por otro lado, no podemos utilizar la única mención del adulterio en la ley, que trata sobre la negación de un bene-ficio al proceso de desvío, para llegar a la conclusión de que *246 si el legislador hubiese querido exceptuar las relaciones adúlteras de la aplicación de la Ley Núm. 54, hubiese he-cho una expresión clara en la ley. Sostener esa conclusión implicaría ignorar los principios de hermenéutica legal penal, los cuales prohíben tipificar conductas como delitos a base del silencio del legislador o por analogías.(51) La inter-pretación de los estatutos penales debe ser restrictiva en lo que desfavorece al acusado y liberal en lo que lo favorece. Por más loable que pueda ser la posición en pro de la víc-tima, en circunstancias como las de este caso, ese enfoque es ajeno a la normativa vigente en nuestra jurisdicción, máxime cuando el legislador ha provisto un mecanismo a través del Código Penal para hacerle justicia a esa víctima. Es un principio elemental que en el campo penal toda con-ducta tipificada como delito, así como sus penas, tienen que estar expuesta con claridad en la ley. Por tal razón, entendemos que conforme al principio de legalidad si el legislador quería aplicar la Ley Núm. 54 a las relaciones adulterinas tenía que hacerlo expresamente.
Asimismo, si interpretamos liberalmente la definición de “relación consensual” y nos enfocamos solo en la víc-tima, no solo violaríamos el principio de legalidad, sino que infringiríamos la política pública enunciada en la Ley Núm. 54. Dicha política pública tiene como propósito cardinal el fortalecimiento de la institución familiar, la cual se visualiza como una política que surge y se ampara en la unión sentimental y legal entre un hombre y una mujer.(52)
Por tal razón, al examinar el historial legislativo, así como el Derecho, entiendo que la relación consensual adul-terina no está protegida por la Ley Núm. 54. No existen bases suficientes en el historial para incluir en la defini-ción de “relación consensual” la relación afectiva entre un hombre y una mujer en la que cualquiera de ellos esté le- *247 galmente casado. La relación antedicha claramente sería una relación adulterina, por ende, ilegal. Cabe señalar, que del expediente surge que este era el tipo de relación que conscientemente, el peticionario y la perjudicada, sostenían. De esta forma, como el Art. 3.1 de la Ley Núm. 54, supra, no abarca ese tipo de relación tenemos que con-cluir que esta no está protegida por esa disposición legal. Por lo tanto, procesar al acusado al amparo de un estatuto que no le es aplicable claramente violaría el principio de legalidad.
Ahora bien, lo anterior no significa que la perjudicada queda desprovista de remedios en ley. Por ejemplo, la Ley Núm. 284 de 21 de agosto de 1999, conocida como Ley contra el Acecho en Puerto Rico, según enmendada,(53) cuenta con varios mecanismos de protección que pueden utilizarse en estos casos.(54) El Art. 2 de este estatuto, 33 L.P.R.A. sec. 4013 n., señala que el Gobierno se reafirma en su política pública de luchar contra cualquier tipo de manifestación de violencia que atente contra los valores de paz, seguridad, dignidad y respeto. Esta ley aplica categóricamente a personas que hayan tenido una relación de cortejo. Al amparo de la misma, un tribunal podrá expedir una Orden de Protección a una persona que haya sido víctima de acecho.
De igual forma, el Ministerio Público cuenta con varias disposiciones del Código Penal con las cuales pudiera rei-niciar el proceso penal. Nuestra postura simplemente se sustenta en que conforme a los hechos y el Derecho que circunscriben el caso de autos, el Art. 3.1 de la Ley Núm. 54 no es de aplicación, supra.
Por último, contrario a lo implicado por la apreciada y distinguida compañera Jueza Asociada Señora Fiol Matta al final de su opinión disidente, mi posición no obedece a “ideas, actitudes o conductas discriminatorias”. Mucho me-nos me hago “cómplice de la violencia de pareja que tantas *248 vidas está destruyendo en Puerto Rico”. Hasta el día en que podamos erradicar el terrible mal de la violencia des-medida que sufre nuestro pueblo, los ciudadanos, sin im-portar su estatus civil, contarán con los remedios que pro-vee la Ley para la Prevención e Intervención con la Violencia Doméstica o, en su defecto, con los mecanismos también efectivos que proveen nuestro Código Penal y otras leyes especiales.
Por otro lado, mi criterio no obedece a ningún prejuicio, pues la norma cardinal del Derecho Penal que constituye el principio de legalidad no conoce estatus civil alguno. Más bien asegura un proceso sustantivo justo al acusado, sin importar cuál sea su relación con la víctima. Por eso no puedo refrendar la posición de la compañera Jueza Aso-ciada Fiol Matta pues, en su análisis, esta va más allá de la mera interpretación de la ley pretendiendo, mediante fíat judicial, ampliar el alcance del delito que se le imputa al peticionario Flores Flores. Avalar que se amplíe el al-cance de un delito por fíat judicial sería nefasto y un pre-cedente peligroso. No podemos arrogarnos el rol de la Asamblea Legislativa. Le compete a dicho Cuerpo formu-lar el marco jurídico que establecerá la política pública y legislar al respecto.
La interpretación que hagamos de la Ley Núm. 54 debe ser cónsona con la política pública enunciada por el legis-lador y guiada por el espíritu que la originó. Como señalamos en Pizarro v. Nicot, 151 D.P.R. 944, 951 (2000):
Reiteradamente hemos resuelto que es
"... principio cardinal de hermenéutica que ‘[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determi-nación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener’.... Nuestra obligación fundamental en estos casos, es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propó-sito que persigue la ley ... Al interpretar y aplicar un estatuto *249 hay que hacerlo teniendo presente el propósito social que lo inspiró (Citas omitidas.(55)
A toda ley se le dará la interpretación que mejor res-ponda a los propósitos que persigue. Los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes disposiciones, supliendo las posibles deficiencias cuando esto fuere necesario.(56) Vía interpreta-ción forzada no podemos jurídicamente ampliar el alcance de un estatuto ignorando el espíritu que lo motivó, sobre todo cuando se trata de un estatuto penal, y dicha inter-pretación militaría en contra del acusado. Como señalan los profesores Bernier y Cuevas Segarra:
En el desempeño normal de sus funciones, los tribunales están obligados a respetar la voluntad legislativa aunque los magis-trados discrepen personalmente de la sabiduría de los actos legislativos. Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa. Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable.(57)
Por todo lo anterior, entiendo que el Tribunal de Apela-ciones actuó correctamente al concluir que en la determi-nación de causa probable para acusar en la Vista Prelimi-nar la prueba no sostenía la concurrencia de todos los elementos del delito imputado. Por tal razón, su actuación de declarar “con lugar” la moción al amparo de la Regla 64(p) de Procedimiento Criminal, supra, presentada por el peticionario y desestimar la acusación fue acertada.

 S. Mir Puig, Derecho Penal: Parte General, 8va ed., Barcelona, Ed. Reppertor, 2008, pág. 106.

 L.E. Chiesa Aponte, Derecho Penal Sustantivo, San Juan, Pubs. JTS, 2007, pág. 43.

 íd.

 íd.

íd.

 33 L.P.R.A. sec. 4630.

 Chiesa Aponte, op. cit, pág. 44.

 íd.

 Pueblo v. Figueroa Garriga, 140 D.P.R. 225, 231 (1996).

 Pueblo v. Martínez Yanzanis, 142 D.P.R. 871, 877 (1997).

 íd.

 33 L.P.R.A. sec. 4631.

 D. Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, 6ta ed., San Juan, Ed. Instituto para el Desarrollo del Derecho, 2010, pág. 76.

 Mir Puig, op. cit., pág. 115.

 Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 549 (1999).

 Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252 (2000).

 Pueblo v. Barreto Rohena, 149 D.P.R. 718, 722 (1999).

 Pueblo v. Figueroa Pomoles, 172 D.P.R. 403, 417 (2007).

 íd.; Pueblo v. Sierra Rodríguez, 137 D.P.R. 903 (1995); Pueblo v. Arandes de Celis, 120 D.P.R. 530 (1988); Pacheco v. Vargas, Alcaide, 120 D.P.R. 404 (1988).

 Pueblo v. Figueroa Pomoles, supra.

 íd.; Pueblo v. De León Martínez, 132 D.P.R. 746, 750-751 (1993).

 Pueblo v. Figueroa Pomoles, supra, págs. 416-417; Pueblo v. Sierra Rodríguez, supra; Pueblo v. Arandes de Celis, supra; Pacheco v. Vargas, Alcaide, supra.

 Chiesa Aponte, op. cit, pág. 47.

 íd.

 E.B. Marín de Espinosa Ceballos, La violencia doméstica, análisis sociológico, dogmático y de derecho comparado, Granada, Ed. Comares, 2001, págs. 1-3.

 R.E. Ortega-Vélez, Sobre ... Violencia Doméstica, 2da ed., San Juan, Ed. Scisco, 2005, pág. 1.

 Exposición de Motivos, Ley Núm. 54 de 15 de agosto de 1989 (1989 Leyes de Puerto Rico 224).

 8 L.P.R.A. sec. 602.

 Véase Pueblo v. Figueroa Santana, 154 D.P.R. 717, 723-724 (2001).

 8 L.P.R.A. sec. 601.

 íd.

 Véase Informe Conjunto de la Comisión de lo Jurídico, de Desarrollo Cultural y Seguridad Social y de la Comisión Especial de Asuntos de la Mujer en torno al Sustitutivo a los Proyectos del Senado 90 y 470 de 25 de junio de 1989.

 íd., pág. 4.

 Informe de la Comisión para los Asuntos de la Mujer ante la Comisión de lo Jurídico, de Desarrollo Cultural y Seguridad Social y la Comisión Especial de la Mujer del Senado sobre el Proyecto del Senado 470, de 1 de junio de 1989, pág. 10.

 íd.

 Véase la discusión de la aprobación del proyecto en el Pleno del Senado, Diario de Sesiones de la Asamblea Legislativa (Senado), 26 de junio de 1989, pág. 2271 et seq.

 Pueblo v. Ruiz, 159 D.P.R. 194, 201 (2003).

 1989 Leyes de Puerto Rico 222.

 Exposición de Motivos, Ley Núm. 54 de 15 de agosto de 1989, supra, pág. 222.

 Pueblo v. Ruiz, supra, pág. 202.

 Art. 1.3(d) de la Ley Núm. 54 (8 L.P.R.A. see. 602).

 Pueblo v. Ruiz, supra, pág. 206. Véanse: Domínguez Maldonado v. E.L.A., 137 D.P.R. 954 (1995); Caraballo Ramírez v. Acosta, 104 D.P.R. 474 (1975).

 Pueblo v. Ruiz, supra, pág. 208.

 íd.

 íd.

 33 L.P.R.A. see. 4758.

 íd.

 D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, 2da ed., San Juan, Ed. Inst. para el Desarrollo del Derecho, 2005, pág. 168.

 8 L.P.R.A. sec. 636.

 Véase Pueblo v. Ruiz, supra, pág. 208.

 Véanse Arts. 2 y 3 del Código Penal de Puerto Rico, 33 L.P.R.A. sees. 4630-4631.

 Pueblo v. Ruiz, supra, pág. 201.

 33 L.P.R.A. sec. 4013 et seq.

 Véase Pueblo v. Ruiz, supra, pág. 213 esc. 20.

 Véanse, además: González Pérez v. E.L.A., 138 D.P.R. 399 (1995); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991).

 Pizarro v. Nicot, supra; González Pérez v. E.L.A., supra; Gobernador v. Alcalde de Coamo, 131 D.P.R. 614 (1992); Zambrana Maldonado v. E.L.A., 129 D.P.R. 740 (1992); Torres v. Castillo Alicea, 111 D.P.R. 792 (1981); R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987.

 Bernier y Cuevas Segarra, op. cit., pág. 299.